## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

Civil Action No. 2:18-cv-00176-DME-MEH

ABEL RAMIREZ, BERENICE RESENDIZ, EDUARDO RAMIREZ,
ALICIA AMAYA CARMONA, CARLOS RAMIREZ,
J.R., J.R., J.R., and K.F.,

        Plaintiffs,

v.

JORDAN REDDISH, DERRYL SPENCER, WALTER BOCKHOLT,
NICHOLAS CHOURNOS, STEVEN DOUGLAS, DANIEL FERRON,
JARED GOLDING, CASEY NELSON, JASON ROOTHOFF,
CHARLIE SANDNESS, TYLER WEBSTER, KARSON WELCH,
JOHN DOES 1, 3-48, U.S. MARSHALS and ICE AGENTS, and
UNITED STATES OF AMERICA.

        Defendants.

_____

**ORDER GRANTING IN PART AND DENYING IN PART INDIVIDUAL DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT (Docs. 182, 186), AND GRANTING IN FULL
DEFENDANT UNITED STATES' SUMMARY JUDGMENT MOTION (Doc. 183)**

_____

        This litigation stems from two unsuccessful attempts by members of the U.S.

Marshals Service Violent Fugitive Apprehension Task Force ("Task Force") to execute

an arrest warrant for Abel Ramirez, Sr. ("Ramirez, Sr.") at his home.  Plaintiffs—nine of

Ramirez, Sr.'s family members—challenge the Task Force's conduct toward them

during those two attempts to find and arrest Ramirez, Sr.  Plaintiffs assert two groups of

claims.

First, Plaintiffs assert a series of <u>Bivens</u>[1] claims, alleging that individual Task Force members violated Plaintiffs' Fourth Amendment rights.  These individual Defendants move for summary judgment (Docs. 182, 186), asserting they are entitled to qualified immunity from these damages claims.

There are material issues of fact that preclude summary judgment on several of these <u>Bivens</u> claims.  Specifically there are material factual disputes as to whether Task Force members had any information that Ramirez, Sr. was in his home as the individual Defendants forced their entry to arrest him.  In addition, there are material factual disputes as to whether Task Force members, once inside Ramirez, Sr.'s home, confined their search for him only to places where a person could be found.  These factual disputes, which a jury will have to resolve, preclude summary judgment to some extent on Counts 1, 2, and 13.  Viewing the evidence before the Court in the light most favorable to Plaintiffs, these claims set out Fourth Amendment violations that were clearly established at the time these events unfolded.

The Court grants the individual Defendants qualified immunity on the remainder of Plaintiffs' <u>Bivens</u> claims.  Although there are a number of deficiencies in their remaining claims, Plaintiffs' primary problem is that they have failed to identify (and the Court has not found on its own) any relevant authority that made the other Fourth Amendment violations Plaintiffs allege clearly established at the time Task Force members took the actions challenged in this case.

---

[1] <u>Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics</u>, 403 U.S. 388 (1971).

Plaintiffs assert a second group of claims under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–2680, seeking to recover damages from the United States for state law torts committed by Task Force members when they attempted to find and arrest Ramirez, Sr.  The United States has moved for summary judgment on these FTCA claims.  (Doc. 183.)  Because Plaintiffs have failed to establish that the United States, through the FTCA, has waived its sovereign immunity from these state law claims, the Court DISMISSES them without prejudice for lack of subject matter jurisdiction.

In sum, as will be explained in greater detail, the Court GRANTS the United States' summary judgment motion in full (Doc. 183), and GRANTS in part, and DENIES in part, the individual Defendants' summary judgment motions (Docs. 182, 186).

## I. OVERVIEW

The Court views the evidence before it in the light most favorable to Plaintiffs and draws all reasonable inferences from the evidence in their favor.  See Donahue v. Wihongi, 948 F.3d 1177, 1187 (10th Cir. 2020).  In October 2016, Ramirez, Sr. was charged in Utah state court with driving under the influence.  His guilty plea to that offense brought him to the attention of U.S. Immigration and Customs Enforcement ("ICE"), where his case was assigned to an ICE agent, Defendant Jordan Reddish. Based on Reddish's investigation, the U.S. Attorney for the District of Utah obtained a felony indictment charging Ramirez, Sr., a Mexican citizen, with unlawfully re-entering the United States after having been previously removed.  See 8 U.S.C. § 1326.  A warrant was then issued for Ramirez, Sr.'s arrest.  Neither Ramirez, Sr. nor any of his

3

family members knew about the arrest warrant until Task Force members attempted to execute it in April 2017.

In addition to being an ICE agent, Reddish was also a member of the U.S. Marshals Service Violent Fugitive Apprehension Task Force for the District of Utah ("Task Force").  This federal Task Force is comprised of federal, state, and local law enforcement officers who serve any federal arrest warrant as well as state warrants for violent fugitives.  During the time relevant here, Defendant Derryl Spencer was the Task Force commander and Defendant Jared Golding was his second-in-command.

ICE agent Reddish enlisted the Task Force's assistance in executing the arrest warrant for Ramirez, Sr.  Reddish was responsible for developing information the Task Force used in their attempts to find and arrest Ramirez, Sr.  Reddish had information that Ramirez, Sr. lived in an apartment complex in Heber City, Utah.  As Task Force members would later discover, a number of Ramirez, Sr.'s immediate family members lived in three separate apartments in that same complex.[2]

The first attempt to arrest Ramirez, Sr. occurred at midday on Monday, April 10, 2017.  Task Force members Golding, Reddish, Nelson, Welch, Ferron, and Roothoff

_____

[2] Task Force members later discovered that Ramirez, Sr., his wife Alicia Amaya Carmona, their adult son Carlos, Carlos's wife Berenice Resendiz and Carlos and Berenice's three small children (all three with the initials J.R.) lived in apartment A103. Another adult son, Abel Ramirez, lived across the breezeway in apartment A104, with his wife and child, K.F.  Although Ramirez, Sr.'s adult son Abel does not go by Jr., the parties refer to him as Abel Ramirez, Jr. in order to distinguish him from his father.  A third adult son, Eduardo Ramirez, lived in a separate building in the same apartment complex, in apartment E205, with his wife and children.  For clarity, the Court will refer to Ramirez, Sr. and Carmona's adult sons by their first names.

4

knocked at apartment A103 ("A103"), announced their presence and, when no one answered, entered.  In the apartment, the Task Force discovered Ramirez, Sr.'s wife, Plaintiff Alicia Amaya Carmona ("Carmona"), who was babysitting four of her grandchildren, ranging in age from two to six years old.[3]  Task Force members found Carmona and her grandchildren hiding in a back bedroom.  Ramirez, Sr. was not there.

The Task Force then turned its attention to the apartment across the breezeway, apartment A104 ("A104"), because "Abel Ramirez" had signed the lease for that apartment.  At that time, Task Force members were unaware that Ramirez, Sr. had an adult son named Abel Ramirez, who lived in A104 with his wife and daughter K.F. [5].  After no one answered the door at A104—because no one was home—several Task Force members entered and searched for, but did not find, Ramirez, Sr.

While Task Force members searched these two apartments, ICE Agent Reddish questioned Carmona regarding the whereabouts of her husband, Ramirez, Sr., and about Carmona's own immigration status.  When Carmona acknowledged that she was unlawfully in the United States, Reddish arrested her.

In light of Carmona's arrest, she and Agent Reddish summoned three of her adult sons—Plaintiffs Carlos Ramirez, Eduardo Ramirez, and Abel Ramirez, Jr.—to come get the children.  Upon the sons' arrival, Reddish and other Task Force members questioned them as to the whereabouts of their father and offered to release their

---

[3] In their original complaint, filed in February 2018, Plaintiffs listed the children as J.R., age six; J.R., age four; J.R., age two; and K.F., who was five years old in April 2017. The Court will refer to these Plaintiffs as J.R. [6], J.R. [4], J.R. [2], and K.F. [5].

mother from custody if the brothers told the Task Force where Ramirez, Sr. was.  After about an hour and one-half, the Task Force left with Carmona in custody.

The second attempt to arrest Ramirez, Sr. occurred the next night, April 11. Task Force members—this time Spencer, Golding, Reddish, Bockholt, Chournos, Douglas, Nelson, Sandness, Welch, and Roothoff—knocked again at A103, announced their presence and, when no one answered the door, this time used a battering ram to knock the front door down and enter.  Ramirez, Sr. was again not there.  Instead, Task Force members discovered Ramirez, Sr.'s daughter-in-law, Berenice Resendiz, and her three children, J.R. [6], J.R. [4], and J.R. [2].  The children had been sleeping in the back bedroom where Resendiz was watching television.

At the same time the Task Force entered A103, several Task Force members knocked at A104 and ordered Abel, Jr., to exit his apartment and stand outside so they could keep an eye on him while the Task Force searched his family members' apartment, A103.  Eduardo walked over to A103 from his apartment located in another building, after hearing the Task Force had returned.  Carlos Ramirez, who was not at home when Task Force members forced their way into his apartment, soon arrived on-scene.  Task Force members—primarily Spencer, Golding, and Reddish—questioned these family members regarding the whereabouts of Ramirez, Sr. and again suggested trading their mother, Carmona, who remained in ICE custody, for their father, Ramirez, Sr.  After approximately an hour and one-half, the Task Force left.

These facts provide a general overview of the events underlying Plaintiffs' claims. Necessary additional details will be discussed below.

## II. Bivens claims alleging individual Defendants
violated the Fourth Amendment (Counts 1-22)

Plaintiffs assert twenty-two Bivens claims alleging that the individual

Defendants—the Task Force members involved in the two raids—violated Plaintiffs'

Fourth Amendment rights to be free from unreasonable searches and seizures during

the Task Force's two attempts to find and arrest Ramirez, Sr.  In Bivens, the Supreme

Court recognized damages claims against individual federal agents for violating the

plaintiff's Fourth Amendment rights during his arrest and the search of his home.  403

U.S. at 389; see also Ziglar v. Abbasi, 137 S. Ct. 1843, 1856–57 (2017) (acknowledging

reluctance to expand Bivens remedy, but declining "to cast doubt on the continued

force, or even the necessity, of Bivens in the search-and-seizure context in which it

arose").[4]

In their summary judgment motions, the individual Defendants contend that they

are entitled to qualified immunity from these Bivens claims.  (Docs. 182, 186.)  To

overcome that defense, Plaintiffs must "satisf[y] a heavy two-part burden."  McCowan v.

---

[4] The individual Defendants named in this case include state and local officers who, as
members of the federal Task Force, are subject to Bivens claims.  See Romero v.
Peterson, 930 F.2d 1502, 1507 (10th Cir. 1991) (stating, in Bivens action, that
"Defendants are . . . federal actors if they act jointly with, under the direction of, or on
behalf of the federal government").  The individual Defendants fall into two groups.  The
Justice Department represents the federal officers on the Task Force, as well as any
state or local officers who had been formally deputized as a federal Task Force member
before April 2017.  But two of the state officers who participated in the attempts to arrest
Ramirez, Sr., Defendants Daniel Ferron and Jason Roothoff, had not yet been formally
deputized as Task Force members at that time.  The Department of Justice, therefore,
declined to represent those two defendants in this litigation and they are instead
represented by the Utah Attorney General's office.  Each group of individual Defendants
has filed a summary judgment motion asserting qualified immunity for essentially the
same reasons.

Morales, 945 F.3d 1276, 1281–82 (10th Cir. 2019) (quoting Estate of Ceballos v. Husk, 919 F.3d 1204, 1212 (10th Cir. 2019)).  First, they must establish an unreasonable search or seizure that violated the Fourth Amendment.  See, e.g., District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018).  The reasonableness of a search or seizure under the Fourth Amendment is measured by an objective standard:  "[T]he question is whether the officers' actions [in conducting the challenged search or seizure] are 'objectively reasonable' in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation."  Graham v. Connor, 490 U.S. 386, 397 (1989).  "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force[, for example]; nor will an officer's good intentions make an objectively unreasonable use of force constitutional."  Id.; see also Nieves v. Bartlett, 139 S. Ct. 1715, 1724–25 (2019).

Second, Plaintiffs must demonstrate that the Fourth Amendment violation was clearly established at the time these events occurred, in April 2017.  See Wesby, 138 S. Ct. at 589.  It is particularly important in the Fourth Amendment context that "the clearly established right . . . be defined with specificity," City of Escondido v. Emmons, 139 S. Ct. 500, 503 (2019), so "that any reasonable official in the defendant's shoes would have understood that" his conduct was unconstitutional, id. (quoting Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018)).  "To be clearly established, ordinarily there must be prior Supreme Court or Tenth Circuit precedent, or the weight of authority from other circuits, that would have put an objective officer [in the same position as the individual Defendants] on notice that he was violating [the] Fourth Amendment . . . ."

8

McCowan, 945 F.3d at 1285 (quoting Estate of Ceballos, 919 F.3d at 1213).  General

statements of the law can clearly establish a right for qualified immunity purposes if they

apply with obvious clarity to the specific conduct in question.  See Hope v. Pelzer, 536

U.S. 730, 741 (2002).[5]

     "A court can consider the two qualified-immunity inquiries—whether the plaintiff

has established a statutory or constitutional violation and whether that violation was

clearly established—in any order."  McCowan, 945 F.3d at 1282 (citing Pearson v.

Callahan, 555 U.S. 223, 236 (2009)).

> If the plaintiff fails to satisfy either part of the two-part inquiry, the court must
> grant the defendant qualified immunity.  If the plaintiff successfully
> establishes the violation of a clearly established right, the burden shifts to
> the defendant, who must prove that there are no genuine issues of material
> fact and that he or she is entitled to judgment as a matter of law.  In short,
> although [the Court] review[s] the evidence in the light most favorable to the
> nonmoving party, the record must clearly demonstrate the plaintiff has
> satisfied his heavy two-part burden; otherwise, the defendants are entitled
> to qualified immunity.

Id. (quoting Estate of Ceballos, 919 F.3d at 1212-13).[6]

---

[5] See A.N. ex rel. Ponder v. Syling, 928 F.3d 1191, 1198 (10th Cir. 2019) (deeming
constitutional violation to be clearly established under law that applied with obvious
clarity to Defendants' challenged actions); Halley v. Huckaby, 902 F.3d 1136, 1149
(10th Cir. 2018) (same), cert. denied, 139 S. Ct. 1347 (2019).

[6] "As an initial matter," Plaintiffs argue that "the doctrine of qualified immunity should be
revisited and severely limited as a matter of federal common law" because "[t]he
doctrine does not, in practice, further the original policy justifications that spurred its
creation, and instead has the perverse effect of 'render[ing] the protections of the Fourth
Amendment hollow.'"  (Doc. 195 at 55 n.3 (quoting Mullenix v. Luna, 136 S. Ct. 305, 316
(2015) (Sotomayor, J., dissenting).)  The Court rejects that argument.  See Ullery v.
Bradley, 949 F.3d 1282, 1301 (10th Cir. 2020) (rejecting a similar argument, stating that
"while Plaintiff asks us to reject the current qualified-immunity framework as

The Court turns now to the merits of each of Plaintiffs' Bivens claims.  At the outset of this discussion, however, the Court notes that, while Plaintiffs have alleged each of their Fourth Amendment claims as a group, Fourth Amendment rights are personal and cannot be asserted vicariously.  See Plumhoff v. Rickard, 572 U.S. 765, 778 (2012).  Therefore, only the named Plaintiff whose own Fourth Amendment rights have been violated can recover for that violation.  See Estate of Redd ex rel. Redd v. Love, 848 F.3d 899, 907 n.14 (10th Cir. 2017); see also Rakas v. Illinois, 439 U.S. 128, 133–34 (1978).[7]

On the other side of a Bivens claim, a defendant is liable only for a constitutional "violation traceable to [his] 'own individual actions.'"  Pahls v. Thomas, 718 F.3d 1210, 1225 (10th Cir. 2013) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)).  It is, therefore, "incumbent upon a plaintiff to identify specific actions taken by particular defendants in order to make out a viable . . . Bivens claim."  Id. at 1226 (quoting Tonkovich v. Kan. Bd. of Regents, 159 F.3d 504, 532 (10th Cir. 1998)).

Finally, Plaintiffs continue, even after discovery, to assert claims against unidentified John Doe Defendants.  That alone would probably warrant dismissing those defendants.  But, as explained below, because Plaintiffs cannot establish a Bivens claim

---

unconstitutional, her competent counsel is well-aware it is not this appellate court's place to issue such edicts.  We, of course, decline to do so here.").

[7] Although the concept of asserting one's own personal Fourth Amendment rights is sometimes referred to as Fourth Amendment "standing," it does not implicate a court's jurisdiction under Article III's standing requirement.  See Byrd v. United States, 138 S. Ct. 1518, 1530 (2018).  Instead, "Fourth Amendment standing" is part of the substantive Fourth Amendment analysis and not "a jurisdictional question."  Id.

against any of the still-unidentified John Doe Defendants, the Court will dismiss those Defendants with prejudice.  See Medina v. Danaher, No. 17-cv-00268-PAB-GPG, 2020 WL 1333094, at *5 n.8 (D. Colo. Mar. 23, 2020) (citing Roper v. Grayson, 81 F.3d 124, 126 (10th Cir. 1996)).

Plaintiffs' Fourth Amendment Bivens claims fall into two general categories, alleging that the individual Defendants 1) unlawfully entered and searched A103 and A104, and 2) unreasonably seized Plaintiffs, using excessive force.  As will be explained, most of the claims in the first category are sufficient to overcome qualified immunity because there are material factual disputes which, when viewed in the light most favorable to Plaintiffs, set forth clearly established Fourth Amendment violations. None of the second category of claims, however, can overcome the individual Defendants' qualified immunity.  Although there are a number of deficiencies with this second group of unlawful seizure and excessive force claims, the primary—and dispositive—problem is that Plaintiffs have failed to identify any prior law that clearly established these alleged Fourth Amendment violations.

## A. Claims alleging individual Defendants unlawfully entry and searched A103 and A104 (Counts 1, 2, and 13)

Plaintiffs' first category of Fourth Amendment Bivens claims alleges that Task Force members unlawfully entered and searched A103 and A104 on April 10 and 11, 2017.  The relevant Fourth Amendment principles that apply here are these.

Task Force members had an arrest warrant for Ramirez, Sr.  "[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is

reason to believe the suspect is within." Payton v. New York, 445 U.S. 573, 603 (1980). This rule applies "so long as the suspect 'possesses common authority over, or some other significant relationship to,' the residence entered by police." Valdez v. McPheters, 172 F.3d 1220, 1225 (10th Cir. 1999) (quoting United States v. Risse, 83 F.3d 212, 217 (8th Cir. 1996)).[8]

Here, then, the Task Force's entry into A103 and A104 was reasonable only if, at the time they entered, Defendants had "a reasonable belief," based on the totality of the facts and circumstances known to them at the time, both that Ramirez, Sr. "(1) lived in the residence and (2) could be found within." Id. In considering whether officers have each of these reasonable beliefs,

> courts "must be sensitive to common sense factors indicating a resident's presence." Direct surveillance or the actual viewing of the suspect on the premises is not required. Indeed, the officers may take into account the fact that a person involved in criminal activity may be attempting to conceal his whereabouts. The suspect's presence may be suggested by the presence of an automobile, the time of day, observing the operation of lights or other electrical devices, and the circumstances of a suspect's employment. And the officers may consider an absence of evidence the suspect is elsewhere. No single factor is . . . dispositive. Rather, the court must look at all of the circumstances present in the case to determine whether the officers entering the residence had a reasonable belief that the suspect resided there and would be found within.

---

[8] On the other hand, officers need a search warrant, in addition to an arrest warrant, in order to enter a third party's residence to execute an arrest warrant for someone who does not live there. See Steagald v. United States, 451 U.S. 204, 205–06, 211–17 (1981).

Id. (citations, footnote omitted).[9]  "The officers' belief need not prove true in fact, it is

sufficient if the belief was objectively reasonable at the time of entry."  Id.

In addition to authorizing an officer "to enter a dwelling in which the suspect lives

when there is reason to believe the suspect is within," Payton, 445 U.S. at 603, an

arrest warrant further authorizes officers "to search anywhere in the house" where the

subject of the warrant might be found, Maryland v. Buie, 494 U.S. 325, 330 (1990).

### 1. Entry into and search of A103 on April 10, 2017 (Count 1)

In Count 1, Plaintiffs allege both that Defendants unlawfully entered A103 on

April 10 and that they also unlawful searched the apartment on that day.[10]

#### a. Unlawful entry

As an initial matter, Plaintiffs originally alleged as a group that all of the named

individual Defendants who were present at the apartment complex on April 10, as well

as unidentified John Does 1, 5-12, and 15-17, unlawfully entered A103.  Plaintiffs now

concede that Eduardo and Abel, Jr. do not have Fourth Amendment "standing" to

---

[9]  The Tenth Circuit, in its 1999 Valdez decision, ruled that Payton's "reasonable beliefs" required "something less than probable cause."  United States v. Denson, 775 F.3d 1214, 1216 (10th Cir. 2014) (citing Valdez, 172 F.3d at 1227 n.5).  But, in 2014, Denson wondered whether the Tenth Circuit should "reconsider Valdez."  Id. at 1217.  Denson did not do so, however, concluding that even if probable cause was required, there was probable cause ("a fair probability") in Denson to believe that the target of the arrest warrant was within his residence at the time the officers entered.  See id. at 1217–18.

[10] The Court understands Plaintiffs, in each of Counts 1, 2 and 13, really to be alleging two separate claims: (1) Defendants unlawfully entered A103.  But (2) even if Defendants' entry was justified, the scope of their search was still constitutionally unreasonable.

recover damages for the alleged unreasonable entry of A103 on April 10.  See Ward v. City of Hobbs, 398 F. Supp. 3d 991, 1092–93 (D. N.M. 2019) (holding homeowner and certain guests have "standing" to challenge constitutionality of law enforcement's entry into a home, citing cases).

The evidence, viewed in the light most favorable to Plaintiffs, see Donahue, 948 F.3d at 1187, indicates the following:  Defendant Reddish had information that Ramirez, Sr. lived in A103.[11]  On April 10, Reddish and his Task Force partner for that day, Defendant Casey Nelson, went to verify that address and to investigate whether Ramirez, Sr. was home that day.  The information they obtained from the apartment complex's management office arguably confused, rather than confirmed, whether Ramirez, Sr. lived in A103.  For example, the temporary assistant leasing manager gave the officers a lease signed by "Abel Ramirez" for A104—not A103.  Reddish also saw the lease for A103, but it was signed by Carlos Ramirez, his wife Resendiz, and his mother Carmona; it did not mention his father, Ramirez, Sr.  While Reddish knew Ramirez, Sr. had a son named Carlos, there is no suggestion that Reddish knew the relationship between Ramirez, Sr. and the other signatories on the A103 lease.  Nevertheless, assuming Reddish had a reasonable belief that Ramirez, Sr. lived in A103, he had no information that Ramirez, Sr. was at home in A103 on that day.

---

[11] Because this information was only several months old, the Court rejects Plaintiffs' assertion that it was, as a matter of law, too stale to support a reasonable belief that Ramirez, Sr. lived in A103.

14

Defendants point to the conversation that Reddish and Nelson had with one of the maintenance workers for the apartment complex, Pedro Gomez.  According to Reddish and Nelson, when they showed Gomez a photo of Ramirez, Sr., Gomez told them he knew the man they were looking for (though not by name), that the man and his family lived in both A103 and A104, and that the man went back and forth between the two apartments.  Furthermore, Reddish and Nelson claim that Gomez pointed out for them the vehicle the man they were looking for usually drove, a dark-colored BMW sports utility vehicle, and told the officers that, when that vehicle was in the parking lot, as it was that day, the man they were looking for was at home.

But Gomez testified to the contrary in his deposition, swearing that on April 10, when the two officers showed him a photo of the man they were looking for, Gomez told the officer he did not know the man.  Gomez's deposition testimony, then, directly contradicts Reddish's and Nelson's version of their conversation.  Viewing contradictory evidence in the light most favorable to Plaintiffs, and drawing all reasonable inferences in their favor, see id., Reddish and Nelson gained no information about Ramirez, Sr. and his family from Gomez.  Thus, Reddish and Nelson had no information indicating that Ramirez, Sr. was in A103 at midday on April 10, when Task Force members

15

entered that apartment to arrest him.[12]  The Task Force's entry into A103 on that day

was, therefore, unreasonable.[13]

 In an effort to avoid that result, Reddish and Nelson further assert that they had

reason to believe that Ramirez, Sr. was in A103 at midday on April 10—a Monday—

because, being in the United States illegally, he could not lawfully work here and so

would logically instead be at home on a week day.  If relevant at all, which this Court

doubts, such generalized conjecture cannot provide a reasonable belief that Ramirez,

Sr. was in A103 at midday on April 10.  Cf. Valdez, 172 F.3d at 1226 (suggesting

specific information about arrestee's employment status was one factor to consider in

determining whether, under totality of circumstances, officers had reasonable belief that

subject of arrest warrant was home). But, even if such general conjecture alone could

support a reasonable belief Ramirez, Sr. would be at home, Reddish's own notes, taken

before Task Force members entered A103 that day, indicated that Ramirez, Sr. had an

auto body shop in Park City, Utah.  That information directly contradicts Reddish's

---

[12]  The fact that Task Force members had no information indicating that Ramirez, Sr. was in A103 that day distinguishes this case from the situation the Tenth Circuit addressed in Valdez, where the majority identified at least some evidence suggesting the subject of the arrest warrant was inside his home, see 172 F.3d at 1226–28.

[13] Ultimately a jury will have to decide whether to believe Reddish's and Nelson's version of their conversation with Gomez, or Gomez's version.  The Court cannot resolve this factual dispute or make credibility determinations at the summary-judgment stage of this litigation.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Nevertheless, the Court notes that deposition testimony from the temporary assistant leasing manager corroborates the officers' version of their conversation with Gomez.

speculation that, because Ramirez, Sr. could not lawfully work in the United States, he would likely be in A103 at midday on a Monday.[14]

Finally, Reddish and Nelson assert that, at the moment Task Force members actually entered A103, they had reason to believe Ramirez, Sr. was inside because, as they prepared to enter, Reddish heard one of the other Task Force officers state that someone was in the apartment.  That, alone, would not be sufficient to create a reasonable belief that it was Ramirez, Sr. who was in A103, in light of the other people Reddish knew were listed on the lease for A103.  But even if information that someone was in A103 that afternoon could create a reasonable belief that it was Ramirez, Sr., Defendants' own evidence on whether one of the officers saw movement in A103 that day is inconsistent.  Though admittedly unsure, Reddish thought it was Golding who stated he saw movement from inside A103.  Golding, instead, stated that it was the next night, April 11, when he reported seeing an adult and a child in A103 just before Task Force officers entered.  Furthermore, Nelson did not recall any officers looking inside A103's windows before the Task Force entered.  Other Task Force officers present that day either could not remember or testified that none of them was in a position to see inside A103.  This inconsistent evidence cannot, alone, give Defendants a reasonable belief that someone, let alone Ramirez, Sr., was in A103 just before the Task Force entered.

---

[14] Reddish claims that the only person from whom he could have obtained information about Ramirez, Sr.'s mechanic shop was the maintenance worker, Gomez and, therefore, the Court cannot consider Reddish's notes.  But where Reddish got that information is also disputed.

In sum, viewing the evidence in the light most favorable to Plaintiffs and drawing all reasonable inferences in their favor, see Donahue, 948 F.3d at 1187, Defendants did not have a reasonable belief that Ramirez, Sr. was inside A103 at midday on April 10 when Task Force members entered that apartment to arrest him.  Plaintiffs, then, have satisfied the first of the two-pronged showing necessary to defeat qualified immunity— they have shown that the Task Force's entry into A103 on April 10 was unreasonable and violated the Fourth Amendment.

Plaintiffs have also satisfied the second qualified immunity inquiry.  This Fourth Amendment violation was clearly established in April 2017 because the Supreme Court held, in 1980, that officers possessing an arrest warrant could enter the residence of the warrant's target to arrest him only if at the time they had "reason to believe the suspect is within."  Payton, 445 U.S. at 602-03; see also Valdez, 172 F.3d at 1225.  Plaintiffs' unlawful entry claim, then, is sufficient to overcome qualified immunity.

Plaintiffs, however, have not established that all of the individual Defendants present on April 10 are liable for the unconstitutional entry into A103 on April 10.  Task Force members asked to assist in executing the arrest warrant for Ramirez, Sr. can rely, where objectively reasonable, on another officer's assertion—here, on Reddish's assertion—that there was a reasonable belief that Ramirez, Sr. lived in A103 and was at home midday on April 10.  See Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1260 (10th Cir. 1998) (citing cases); see also 2 Wayne R. LaFave, Search and Seizure, A Treatise on the Fourth Amendment, § 3.5(a), (b) (5th ed. updated to Oct. 2019).  Plaintiffs have not shown that it was objectively unreasonable for any of the other individual

18

Defendants, except for Nelson, to rely on Reddish's assertions.[15]  See Felders ex rel. Felders v. Malcom, 755 F.3d 870, 883 (10th Cir. 2014) (stating that "the law clearly provided that . . . reliance on a fellow officer's conclusions must be objectively reasonable").

As for Nelson, he was with Reddish when he gathered information at the apartment complex about where Ramirez Sr. lived and whether he was home that day. Nelson testified during his deposition that he heard the maintenance worker, Gomez, give Reddish information indicating that Ramirez, Sr. lived in A103 and was at home on April 10.  If, as Gomez testified in his deposition, he did not give Nelson and Reddish that information, then it was objectively unreasonable for Nelson to rely on Reddish's assertion to the Task Force that Ramirez, Sr. was home in A103 on April 10.

In sum, Plaintiffs (all except Eduardo and Abel, Jr.) have asserted a claim for a clearly established Fourth Amendment violation against Defendants Reddish and Nelson based on the Task Force's unjustified entry into A103 on April 10.

### b. Unreasonable search

Plaintiffs further allege that, once inside A103, Task Force members exceeded the permissible scope of the search for Ramirez, Sr.  Disputed issues of material fact preclude summary judgment on this claim, too.

---

[15] Plaintiffs point out that Defendant Roothoff also knew that Ramirez, Sr. had a mechanic shop in Park City.  But that knowledge alone would not have made it unreasonable for Roothoff to rely on Reddish's assertion that Ramirez, Sr. was home on April 10 because his car was spotted in the parking lot.

Plaintiffs presented evidence that, when they entered A103 after the Task Force had searched the small apartment for more than thirty minutes looking for Ramirez, Sr., drawers had been opened and clothing had been removed from those drawers.  Buie clearly established, in 1990, that an arrest warrant authorizes only a limited search of areas where a person could be, 494 U.S. at 330, 333; searching inside drawers would obviously exceed that authority.  See Cuevas v. DeRoco, 531 F.3d 726, 736-37 (9th Cir. 2008) (holding that "opening at least one drawer during the protective sweep" violated the Fourth Amendment and denying officer qualified immunity because "limits of a lawful protective sweep were . . . clearly established at the time of the search," citing Buie); see also United States v. Dabrezil, 603 F. App'x 756, 760 (11th Cir. 2015) (unpublished) ("The scope of a protective sweep is restricted to only areas large enough to harbor a person and therefore does not encompass closed drawers or containers.").  Although the individual Defendants who entered A103 deny searching anywhere other than where a person could hide, the Court must view the evidence in the light most favorable to Plaintiffs.  See Donahue, 948 F.3d at 1187.

Plaintiffs, then, who lived in A103 (Carmona, Carlos and his wife Resendiz, and their children, J.R. [6], J.R. [4], and J.R. [2]), and K.F. [5], who was present at the time officers entered and searched A103, have "standing" to assert this unlawful search claim against the individual Defendants who entered A103 on April 10, Defendants Reddish, Nelson, Welch, Ferron, Roothoff, and Golding.  See United States v. Jones, 44 F.3d 860, 871 (10th Cir. 1995) ("An illegal search . . . only harms those with legitimate expectations of privacy in the premises searched."); Ward, 398 F. Supp. 3d at

1092–93 (holding homeowner and guest "with degree of acceptance in the household" who was present during search have "standing" to challenge search).

### c. Conclusion as to Count 1

To summarize, the Court DENIES summary judgment to the extent all Plaintiffs except Eduardo and Abel Jr. allege an unconstitutional entry against Defendants Reddish and Nelson, and Plaintiffs who lived in A103—Carmona, Carlos, Resendiz and their three children, plus guest K.F. [5]—allege an unconstitutional search against Defendants Reddish, Nelson, Welch, Ferron, Roothoff, and Golding. The Court GRANTS all other individual Defendants summary judgment on Count 1.

### 2. Entry into and search of A104 on April 10 (Count 2)

In Count 2, Plaintiffs allege that Task Force members violated the Fourth Amendment both by unjustifiably entering A104 in an effort to find and arrest Ramirez, Sr., and in impermissibly searching that apartment.

### a. Unlawful entry

For essentially the same reasons set forth in the previous discussion of Task Force members' unconstitutional entry into A103, the Task Force's entry into A104 on April 10 was also a clearly established Fourth Amendment violation. Based on the fact that the lease for A104 was signed by "Abel Ramirez," Reddish may have had a sufficiently reasonable belief that Ramirez, Sr. lived in A104, or at least "possesse[d] common authority over, or some other significant relationship to" that apartment,.

Valdez, 172 F.3d at 1226 (internal quotation marks omitted).[16]   But he had no reasonable belief that Ramirez, Sr. was inside A104 when the Task Force members entered that apartment on April 10.  In fact, there was no indication that anyone was in A104 at that time.

Reddish and Nelson assert that they had reason to believe Ramirez, Sr. was in A104 because the Task Force did not find him in A103.  That is persuasive only if the Court credits Reddish's and Nelson's version of what the maintenance worker Gomez told them—that the man the officers were looking for went back and forth between A103 and A104 and drove the dark SUV that was in the parking lot that day.  But, viewing the evidence in the light most favorable to Plaintiffs, the Court cannot credit Reddish's and Nelson's version of events over Gomez's contrary deposition testimony.  Plaintiffs, then, have overcome Defendants' qualified immunity defense by asserting that the Task Force's unjustifiably entry violated clearly established Fourth Amendment rights.

A question remains, however, as to which parties this claim pertains.  Plaintiffs have not shown that any of them, beyond Abel Ramirez, Jr. and his daughter K.F. [5], who both lived in A104, have "standing" to assert this Fourth Amendment claim.  See Ward, 398 F. Supp. 3d at 1092–93.

---

[16] The fact that Reddish may have mistakenly believed that the "Abel Ramirez" who had actually signed the lease for A104 was Ramirez, Sr., when in fact it was instead his son, Abel, Jr., would not invalidate the entry because such a mistaken belief would have been objectively reasonable.  See Valdez, 172 F.3d at 1225.

As for the proper Defendants, Plaintiffs initially asserted this claim against only unidentified John Does 30-33.  After discovery, Plaintiffs have now identified these defendants by name—Reddish, Nelson, and Golding.[17]  Nelson and Golding acknowledge entering A104 to search for Ramirez, Sr.  But Golding asserts that he did so based on information Reddish provided him indicating that Ramirez, Sr. was in A104 that day.  Plaintiffs have not shown that Golding's reliance on Reddish was objectively unreasonable.  To the extent Count 2 challenges the unlawful entry into 104A, therefore, the Court GRANTS Golding summary judgment and DENIES Reddish and Nelson summary judgment.

### b. Unreasonable search of A104

Like the search of A103 on April 10, Plaintiffs have presented evidence that, when they entered A104 after Defendants Golding and Nelson searched that apartment for Ramirez, Sr., drawers had been opened and clothing removed from those drawers. This evidence establishes a Fourth Amendment violation clearly established in 1980 by Buie, which held that an arrest warrant authorizes only a limited search of areas in the arrestee's home where a person could be found.  See 494 U.S. at 330, 333.  Searching

---

[17] These Defendants do not suggest that they have been prejudiced by Plaintiffs not identifying them by name until now.  Furthermore, all three of these individual Defendants were served with the operative third amended complaint and, thus, have been aware all along of Plaintiffs' allegations in support of Count 2.  Moreover, Golding and Nelson acknowledge that they entered and cleared A104 on April 10.  To the extent Plaintiffs have (improperly) moved to amend their third amended complaint to substitute Reddish, Nelson, and Golding for the three John Does defendants, the Court DENIES that motion.  Plaintiffs' offer to amend, buried in their opposition to summary judgment, is not a proper motion. See DUCivR 7-1(b)(1)(A).  But, in any event, amendment is not necessary under these circumstances.

inside drawers would obviously exceed that authority.  See Cuevas, 531 F.3d at 736–37 (9th Cir.); see also Dabrezil, 603 F. App'x at 760 (11th Cir.).

Plaintiffs who lived in A104 (Abel, Jr. and K.F. [5]) have "standing" to challenge the search of their apartment, see Jones, 44 F.3d at 871, and can assert this claim against the individual Defendants who entered and searched A104, Defendants Golding and Nelson.  The Court, therefore, DENIES these two individual Defendants summary judgment on Count 2 to the extent that claim challenges the scope of the search.

### c. Conclusion as to Count 2

To the extent Count 2 challenges the unjustifiable entry into A104, the Court DENIES Defendants Reddish and Nelson summary judgment, and to the extent Count 2 challenges the subsequent search of A104, the Court DENIES Defendants Golding and Nelson summary judgment.  The Court GRANTS summary judgment on Count 2 to all other Defendants.

### 3. Entry into and search of A103 on April 11, 2017 (Count 13)

In Count 13, Plaintiffs allege that the Task Force violated the Fourth Amendment by unjustifiably entering A103 again, this time on April 11, and unreasonably searching the apartment on that night as well.

### a. Unlawful entry

Contemplating a second attempt to find and arrest Ramirez, Sr., Reddish (without Nelson) returned the next night, April 11, 2017, to the apartment complex to determine whether Ramirez, Sr. was there.  By this time, Reddish had a reasonable

belief that Ramirez, Sr. lived in A103 because his family members had told Reddish as much the day before, on April 10.

Nevertheless, Reddish still had no reasonable belief that Ramirez, Sr. was in A103 the night of April 11.  Reddish did observe that there were lights on in A103 that night.  That fact suggested <u>someone</u> was inside A103, but Reddish knew that at least two other adults and three children also lived in that apartment.  For the same reason, the fact that Golding, while stationed outside A103 later that night, saw an adult silhouette through a bedroom window just before the Task Force entered was not sufficient, without more, to give the Task Force a reasonable belief that it was Ramirez, Sr. who was in the apartment that night.  Nor was it sufficient that Reddish now knew from Ramirez, Sr.'s family members that he worked during the day, because by this time Reddish also was aware that Ramirez, Sr. probably knew by now that law enforcement was looking for him.[18]  The information Reddish had—that there were lights on, there was an adult in A103, and Ramirez, Sr. worked during the day—was insufficient to create a reasonable belief that Ramirez, Sr. was inside A103 when Task Force members entered it on April 11.  Their entry, therefore, was a clearly established Fourth Amendment violation.  <u>See</u> <u>Payton</u>, 445 U.S. at 602–03.

---

[18] Reddish again relies on information that he says he got from maintenance worker Gomez as to Ramirez, Sr.'s vehicle, which was still in the apartment parking lot that night.  But viewing the evidence in the light most favorable to Plaintiffs, <u>see</u> <u>Donahue</u>, 948 F.3d at 1187, Gomez did not provide Reddish with any information about Ramirez, Sr.'s vehicle.  Moreover, the fact that that vehicle was still in the parking lot on April 11 was not as persuasive an indication that Ramirez, Sr. might be there that night because the car had also been there the day before, yet Ramirez, Sr. was not present.

As for the proper parties to this claim, Plaintiffs do not dispute that Abel, Jr., his daughter K.F. [5], and Eduardo lack Fourth Amendment "standing" to assert this claim because they neither lived in A103 nor were they present in A103 on April 11 when Task Force members forcibly entered.  See Ward, 398 F. Supp. 3d at 1092–93.  As for the proper defendant(s), Plaintiffs have not shown that any of the individual Defendants (including Nelson this time) were objectively unreasonable in relying on information from Reddish suggesting that Ramirez, Sr. was inside A103 on April 11.  Therefore, to the extent Count 13 challenges the Task Force's entry into A103 on April 11, the Court DENIES Reddish summary judgment, but GRANTS all other Defendants summary judgment.

### b. Unreasonable search

Plaintiffs have not submitted any evidence that the April 11 search of A103 exceeded the scope of a search permitted under Buie—a search for any areas where a person could be found.  See 494 U.S at 330, 333.  Plaintiffs presented evidence that Defendants went through closets and threw off bedclothes.  But contrary to Plaintiffs' assertion, Buie permits searching inside closets and in and under beds because a person could hide in those places.  See id. at 334.

Plaintiffs go on to allege that Defendants ransacked A103 that night during their fifteen-minute search for Ramirez, Sr. in the small apartment, and in the process, broke a closet door.  But Plaintiffs fail to cite any prior case law that would have made such conduct a clearly established Fourth Amendment violation on April 11, 2017.  The

Court, therefore, GRANTS Defendants summary judgment on Count 13 to the extent it challenges the scope of this April 11 search.

### c. Conclusion as to Count 13

The Court DENIES summary judgment to Reddish to the extent Count 13 challenges the entry in A103 on April 11, and otherwise GRANTS Defendants summary judgment.

## B. Seizures and the use of force on April 10 and 11

Plaintiffs' second general category of Bivens claims alleges that the individual Defendants unreasonably seized Plaintiffs, and used excessive force in doing so, during the Task Force's two attempts to find and arrest Ramirez, Sr. As explained below, none of these claims can overcome qualified immunity, often for many reasons, but first and foremost because Plaintiffs have failed to identify—in many cases have failed to even try to identify—any clearly established Fourth Amendment rights that Defendants violated.

The Fourth Amendment principles pertinent to these seizure and excessive force claims include the following. A seizure, for Fourth Amendment purposes, occurs "when, 'taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" Kaupp v. Texas, 538 U.S. 626, 629 (2003) (quoting Florida v. Bostick, 501 U.S. 429, 437 (1991)); see also United States v. Hernandez, 847 F.3d 1257, 1263–64 (10th Cir. 2017). Young children are similarly "seized for Fourth Amendment purposes," Halley, 902 F.3d at 1145, in

27

situations where "no reasonable child would have believed that he was free to leave," id. (Jones v. Hunt, 41 F.3d 1221, 1226 (10th Cir. 2005)).

"'Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave,' includ[e] 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" Kaupp, 538 U.S. at 630 (alteration omitted) (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)).  A seizure only occurs, however, when a person submits to an officer's display of authority.  See United States v. Easley, 911 F.3d 1074, 1080 (10th Cir. 2018), cert. denied, 139 S. Ct. 1644 (2019)  The existence of a seizure is ultimately a legal question that turns on the historical facts.  See United States v. Gaines, 918 F.3d 793, 796 (10th Cir. 2019).

The Fourth Amendment proscribes only unreasonable seizures.  See Reeves v. Churchich, 484 F.3d 1244, 1260 (10th Cir. 2007).  The objective reasonableness of a seizure is determined by "balancing . . . 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Graham, 490 U.S. at 396 (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985)).  "The Supreme Court has recognized that detention or control of both suspects and non-suspects may be necessary [and thus reasonable] to insure officer safety and to maintain the officers' control over a crime scene."  Walker v. City of Orem, 451 F.3d 1139, 1149 (10th Cir. 2006).  Most relevant here, "officer safety may justify protective detentions" of individuals other than the arrestee when officers enter a

residence to execute an arrest warrant.  United States v. Maddox, 388 F.3d 1356, 1362

(10th Cir. 2004).  Such "a protective detention justified on officer safety grounds is

'decidedly not "automatic," but may be conducted only when justified by a reasonable,

articulable suspicion that . . . a person pos[es] a danger to those on the arrest scene.'"

Id. at 1365 (quoting Buie, 494 U.S. at 336).  Not only must such a protective detention

during execution of an arrest warrant in a subject's home "be justified at its inception,

but . . . the scope of seizure employed must also be reasonable under the

circumstances."  Id. at 1367.  Moreover, such a "protective detention should 'last[ ] no

longer than is necessary to dispel the reasonable suspicion of danger and in any event

no longer than it takes to complete the arrest and depart the premises.'"  Id. at 1367–68

(quoting Buie, 494 U.S. at 335–36); see also Muehler v. Mena, 544 U.S. 93, 100 (2005)

("The duration of a detention can . . . affect the balance of interests under Graham.").

One of the factors in determining the reasonableness of a seizure is how the

seizure is made.  See Garner, 471 U.S. at 7-8.  The right to seize an individual

"necessarily carries with it the right to use some degree of physical coercion or threat

thereof to effect it."  Graham, 490 U.S. at 396.  Where officers unlawfully seize a

person, "but use no more force than would have been reasonably necessary if the

[seizure] were warranted, the plaintiff has a claim for unlawful [seizure] but not an

additional claim for excessive force."  Cortez v. McCauley, 478 F.3d 1108, 1126 (10th

Cir. 2007) (reh'g en banc).

"The degree of physical coercion that law enforcement officers may use [to effect

a seizure] is not unlimited, however, and 'all claims that law enforcement officers have

used excessive force . . . [to seize] a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard.'" Id. at 1125 (quoting Graham, 490 U.S. at 395). "As in other Fourth Amendment contexts, . . . the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham, 490 U.S. at 397. The objective reasonableness "of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," keeping in mind "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 396–97.

In analyzing excessive force claims, the Tenth Circuit has "held that the interests protected by the Fourth Amendment are not confined to the right to be secure against physical harm; they include liberty, property, and privacy rights—a person's sense of security and individual dignity." Cortez, 478 F.3d at 1125–26 (quoting Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 196 (10th Cir. 2001)). "Physical contact is not required for an excessive force claim—patently unreasonable conduct is." Id. at 1131; see also id. at 1132 (recognizing excessive force claim based on "substantial and unjustified invasion of [detained individual]'s personal security").

Whether an officer used excessive force is a mixed question of law and fact. See Donahue, 948 F.3d at 1187. "[W]here there are no disputed questions of historical fact such as on summary judgment"—where the court must view the evidence in the light

most favorable to the non-moving party—"the court makes the determination of . . . excessive force on its own as a question of law." Id. (internal quotation marks omitted, alterations incorporated) (quoting Cavanaugh v. Woods Cross City, 718 F.3d 1244, 1253 (10th Cir. 2013)).

To be liable for the use of excessive force,

> [i]t is not necessary that a police officer actually participate in the use of excessive force . . . .  Rather, an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance.

Mascorro v. Billings, 656 F.3d 1198, 1204 n.5 (10th Cir. 2011).  The same is true for an officer who fails to intervene to stop an unlawful seizure.  See Jones v. Norton, 809 F.3d 564, 576 (10th Cir. 2015).[19]

### 1. General force the Task Force used on April 10 and 11 (Counts 11, 17)

First, Plaintiffs assert two broad claims that appear to challenge as excessive the general manner in which the Task Force attempted to execute the arrest warrant for Ramirez, Sr.  In Count 11, Plaintiffs allege that the named individual Defendants present on April 10—Reddish, Nelson, Ferron Golding, Roothoff, and Welch, as well as John Does 1, 3, 5-20—unreasonably seized Plaintiffs when these Defendants, "all armed and in military style gear, surrounded Plaintiffs' homes, all ostensibly in hopes of finding a

---

[19] Defendants complain that Plaintiffs did not allege in their complaint, but only asserted for the first time in their opposition to summary judgment, that individual Defendants were liable for failing to intervene to prevent unlawful seizures or the use of excessive force.  The Court does not expressly address that waiver argument, however, because Plaintiffs have, in any event, failed to assert claims for unlawful seizure and excessive force that can overcome the individual Defendants' qualified immunity.

man wanted for a non-violent crime."[20]  (Doc. 125 ¶ 246.)  Count 17 makes similar

allegations—against Defendants Reddish, Spencer, Chournos, Douglas, Nelson,

Bockholt, Golding, Roothoff, Sandness, Webster, Welch, and John Does 1, 3-4, 21-29,

34-48—regarding their attempt to execute the arrest warrant again on April 11.

The Tenth Circuit has recognized Fourth Amendment excessive force claims

challenging the decision to deploy such a show of force.  For example, Holland ex rel.

Overdorff v. Harrington, 268 F.3d 1179 (10th Cir. 2001), considered a Fourth

Amendment excessive force claim against those officers who made the decision to

deploy a SWAT team to execute a search warrant and misdemeanor arrest warrant.  Id.

at 1183, 1186–92.  Plaintiffs, however, do not invoke this line of cases.

Under the Holland line of cases, the determination of whether "the use of a

SWAT team to effect a seizure . . . amounted to excessive force" turns on the objective

reasonableness test, "'balanc[ing] the nature and quality of the intrusion on the

individual's Fourth Amendment interests against the importance of the governmental

interests alleged to justify the intrusion.'"  Id. at 1190 (quoting Garner, 471 U.S. at 8).

Plaintiffs, however, have not attempted to make that showing in support of Counts 11

and 17.

Nor have they attempted to show that any Fourth Amendment violation alleged in

Counts 11 and 17 was clearly established in April 2017.  The Tenth Circuit has left

---

[20] See also Doc. 195 at 98 (asserting that "Count 11 is . . . based on the totality of the circumstances on April 10, including but not limited to the number of officers at the scene brandishing weapons, which cumulatively show that all the Plaintiffs were seized on April 10 and the force employed was unreasonable").

"open the possibility that sending a large number of agents to execute a search warrant and arrest warrant for a nonviolent crime can amount to excessive force." Estate of Redd, 848 F.3d at 910. But Plaintiffs fail to cite (and the Court has not found) any Supreme Court or Tenth Circuit case, or the weight of authority from other circuits, determining that there was a Fourth Amendment violation under circumstances similar to those presented here. See Holland, 268 F.3d at 1191 (rejecting argument that it was unreasonable to deploy SWAT team in that case to execute search warrant and misdemeanor arrest warrant); see also Estate of Redd, 848 F.3d at 906–11 (considering, but rejecting, excessive force claim based on number of agents wearing "SWAT-like gear" used to execute search and arrest warrants). Defendants are, thus, entitled to qualified immunity and the Court, therefore, GRANTS them summary judgment on Counts 11 and 17.

Plaintiffs can still challenge the objective reasonableness of "[t]he specific conduct" of the individual Defendants during the April 10 and 11 raids. Holland, 268 F.3d at 1191. Plaintiffs do so in a number of other Fourth Amendment Bivens claims they assert, which the Court addresses next.

### 2. Seizures and force used on April 10[21]

#### a. Seizing Carmona and her four grandchildren (Counts 3, 4, and 5)

---

[21] For the following unlawful seizure and excessive force claims, Plaintiffs have not shown that any Plaintiff other than the one subject to the challenged seizure has "standing" to assert these Fourth Amendment claims. See United States v. Mosely, 743 F.3d 1317, 1323 (10th Cir. 2014) (stating individual has "standing to contest the lawfulness of his own seizure"); see also Murphy v. Bitsoih, 320 F. Supp. 2d 1174, 1184–85 (D. N.M. 2004) (noting family members did not have "standing" to pursue claim for excessive force used against their relative); Estate of Fuentes ex rel. Fuentes v. Thomas, 107 F. Supp. 2d 1288, 1291, 1295–96 (D. Kan. 2000) (same).

In Counts 3 and 4, Carmona and her four grandchildren—J.R. [6], J.R. [4], J.R. [2] and K.F. [5]—allege that some of the individual Defendants—Reddish, Nelson, Ferron, Golding, Roothoff, Welch, and John Does 1, 5-12, and 15-17—unreasonably seized them when Defendants entered A103 on April 10 attempting to execute the arrest warrant for Ramirez, Sr.  Carmona testified during her deposition that, while she was babysitting her grandchildren on April 10, she looked out a bedroom window at about noon and saw "many" armed men "running" "straight toward our apartment." (Doc. 184-14, tr. 79-80.)  She "did not know if they were police officers or immigration." (Id. at 79–80.)  Carmona called her son Carlos, who was at work, and he advised her to take the children into a bedroom "and not open the door to anybody."  (Id. at 80, 90.) She followed his advice.  Defendants, after knocking for several minutes without getting any response, entered A103 and ordered everyone in the bedroom to come out with their hands up.  Carmona had the children follow behind her as she exited the bedroom with her hands up.  Officers then ordered Carmona and the children out of the apartment.

Defendants seized Carmona and her grandchildren by ordering them out of the apartment.  See Storey v. Taylor, 696 F.3d 987, 993 (10th Cir. 2012) ("[A] sufficiently coercive order requiring an individual to leave his own house counts as a seizure subject to the protection of the Fourth Amendment.").  But that temporary seizure was objectively reasonable to clear the apartment and control the scene while officers looked for Ramirez, Sr., and to insure both the officers' and the apartment occupants' safety.  See Walker, 451 F.3d at 1149 (recognizing that officers executing arrest warrant

34

may also need to detain non-suspect in order to insure officer safety and allow officers to maintain control of the scene); see also Maddox, 388 F.3d at 1361–63; Thompson v. City of Lawrence, 58 F.3d 1511, 1517 (10th Cir. 1995).  See generally Buie, 494 U.S. at 334–35 (recognizing that officers entering home to execute arrest warrant can take limited and reasonable steps to protect themselves).  Although Plaintiffs argue that "a 50-year-old grandmother with no criminal record taking care of four [small] children" did not present any threat to Task Force officers (Doc. 195 at 77), there is no indication that Defendants knew when they initially entered A103 who was hiding inside or what their relationship was to Ramirez, Sr.  See Maddox, 388 F.3d at 1361–63; Thompson, 58 F.3d at 1517.  It was further reasonable for Defendants both to order Carmona and the children out of the small apartment and to detain them temporarily outside while Task Force officers searched A103 for Ramirez Sr.  See Maddox, 388 F.3d at 1361–63; Thompson, 58 F.3d at 1517.  But even if the individual Defendants violated the Fourth Amendment by thus seizing Carmona and her grandchildren, Plaintiffs have not identified any relevant prior case law that clearly established a Fourth Amendment violation under analogous circumstances.

During this detention, Reddish and another officer questioned Carmona regarding Ramirez, Sr.'s whereabouts and also about Carmona's own immigration status.  See Muehler, 544 U.S. at 100–01.  Plaintiffs have presented no evidence that this questioning prolonged Carmona's otherwise reasonable temporary detention during the search for Ramirez, Sr.  See id. at 101.

35

When Carmona acknowledged to Reddish that she was unlawfully in the United States, he then had probable cause to arrest her.  See Cortez, 478 F.3d at 1115 (noting that warrantless arrest is permissible when officer has probable cause to believe individual has committed a crime).  Being unlawfully in the United States is a federal misdemeanor offense, see 8 U.S.C. § 1325(a), and Reddish, as an ICE agent, had authority to arrest any alien "if he has reason to believe that the alien . . . is in the United States in violation of any" immigration law or regulation, see 8 U.S.C. § 1357(a)(2).[22]

Plaintiffs further allege that Defendants unreasonably detained the children for at least twenty minutes after Defendants determined that Ramirez, Sr. was not in A103.  Although the duration of a protective detention of non-suspects during the execution of an arrest warrant in the arrestee's home is not unlimited, see Maddox, 388 F.3d 1367–68 (stating that "the protective detention should 'last[ ] no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises'" (quoting Buie, 494 U.S. at 335–36)), the problem Task Force officers had here was that, having arrested Carmona, there was no other adult present who could care for the children.  Viewing the evidence in the light most favorable to Plaintiffs, Defendants did no more than watch the children until their parents or other adults arrived to take care of them.  When a family friend, Celia Herbert, arrived to get K.F. [5], for example, officers did not prevent her from entering

---

[22] Plaintiffs contend that the real reason Reddish arrested Carmona was to use her possible release from custody as leverage to bargain with the Ramirezes for information on Ramirez, Sr.'s whereabouts.  But the determination of whether there has been a Fourth Amendment violation turns on the objective reasonableness of Reddish arresting Carmona, not on his subjective motivation.  See Graham, 490 U.S. at 397.

A103 and getting the child.  Officers also let Abel, Jr. retrieve K.F. [5]'s backpack from A103 and give it to Herbert.  Berenice Resendiz testified at her deposition that when she arrived, she was able to walk over to her three children, who were at that time on a grassy area outside A103 and A104.  Further, an officer holding Resendiz's crying two-year-old set the child down so that Resendiz could pick her up.  Even if this could be considered an unreasonable seizure of the children, however, Plaintiffs have failed to identify any relevant case law that clearly establishes such a Fourth Amendment under sufficiently analogous circumstances.

For the foregoing reasons, then, Counts 3 and 4 cannot overcome Defendants' qualified immunity.

In Count 5, Carmona and her four grandchildren further allege that the same Defendants identified in Counts 3 and 4 used excessive force in seizing them by shouting and pointing weapons at them and ordering them to leave A103 and go outside into the cold.  See Holland, 268 F.3d at 1192–94 (considering, in addressing excessive force claim, evidence that officers pointed weapons and used harsh language).  See generally Cortez, 478 F.3d at 1125–26 (recognizing excessive force claim based on allegations officers intruded on detainee's "sense of security and individual dignity" (quoting Holland, 268 F.3d at 1196)).

In support of this excessive force claim, Carmona reasserts that Defendants pointed weapons at her for fifteen to thirty seconds, ordered her and her grandchildren to come out of the back bedroom with their hands up, and then ordered them to leave the apartment.  Use of weapons, however, is justified "where the police reasonably

believe the[y . . .] are necessary for [officers'] protection," Lundstrom v. Romero, 616

F.3d 1108, 1121 (10th Cir. 2010) (quoting United States v. Neff, 300 F.3d 1217, 1220

(10th Cir. 2002)); where, for example, there was "at least a perceived risk of injury or

danger to the officers or others, based upon what the officers know at that time," id.

(quoting Thomas v. Durasanti, 607 F.3d 655, 669 (10th Cir. 2010)).  Such was the case

here, where officers were entering a home in an effort to execute an arrest warrant.

See generally Buie, 494 U.S. at 334–35 (recognizing that officers entering home to

execute arrest warrant can take limited and reasonable steps to protect themselves).

Although Plaintiffs argue that Defendants sought to arrest Ramirez, Sr. for a non-violent

offense, officers also knew that several years earlier he and his son Carlos had been

charged with aggravated assault involving a knife and a gun (though they had pled

guilty to a lesser offense).  In any event, Task Force members did not know who was

hiding in the bedroom when they entered A103.

Furthermore, viewing the evidence in the light most favorable to Plaintiffs, the

individual Defendants only briefly (fifteen seconds, more or less, according to Carmona)

pointed weapons at her and her grandchildren behind here, just until officers perceived

they posed no threat.  That was reasonable.  See Reeves, 484 F.3d at 1260–61

(holding it was reasonable for officers seeking potentially armed male suspect to point

their weapons briefly at woman and her teenaged daughter, where officers did not know

relationship between woman, her daughter, and the suspect and where officers did not

continue to point their weapons once "the perceived threat was extinguished"); cf.

Holland, 268 F.3d at 1192–93 (stating, in case where officers held children on the

ground at gunpoint for ten to fifteen minutes, that, "[w]hile the SWAT Team's initial show of force may have been reasonable under the circumstances, continuing to hold the children directly at gunpoint after the officers had gained complete control of the situation . . . was not justified under the circumstances at that point").

Carmona and her grandchildren further assert it was unreasonable for Defendants to detain Carmona right outside A103's door and to keep her separated from her grandchildren, who were ordered to sit on the nearby stairs. Those stairs, however, were within a few feet of Carmona; the children could still hear and see their grandmother, and vice versa. That was not unreasonable. Rather, it was a reasonable means to control the scene, maintain custody of Carmona, who had been arrested, and insure the safety of the officers and A103's occupants. See Walker, 451 F.3d at 1149.

Plaintiffs also argue that detaining the children in the cold for at least twenty minutes was unreasonable, especially because the children were not dressed for the cold. But the government interests at stake here arguably outweighed the children's brief detention outdoors. For these reasons, Plaintiffs have failed to establish that Task Force members used excessive force, in violation of the Fourth Amendment, in detaining Carmona and her grandchildren on April 10.

But even if Plaintiffs have established a Fourth Amendment violation, they have not identified any relevant authority, clearly established by April 2017, that would have put Defendants on notice that their conduct in seizing Carmona and her grandchildren on April 10, 2017, amounted to an unconstitutional use of excessive force. Cortez, on which Plaintiffs rely, did not involve sufficiently analogous circumstances. In Cortez,

officers went to the Cortez residence in the middle of the night and arrested Rick Cortez without a warrant when he answered the front door.  See 478 F.3d at 1113.  The Tenth Circuit held that officers then used excessive force to detain Tina Cortez, Rick's wife, when an officer entered the home, without any authority to do so, grabbed Tina by the arm, took her cell phone, physically escorted her outside, took the keys and locked the house, and then detained her in the back of a patrol car for more than an hour.  Id. at 1113, 1130–31.  Those facts are not sufficiently analogous to the circumstances presented here, where the Task Force had an arrest warrant for Ramirez, Sr., authorizing them to enter his home (if they reasonably believed he was there), officers did not know who was hiding in the bedroom when they entered the apartment, they ordered Carmona and her grandchildren to come out of the bedroom and leave the apartment, and when they did so, officers temporarily detained them just outside A103 while Task Force members searched for Ramirez, Sr.  Different than in Cortez, any further detention of Carmona was justified after Reddish developed probable cause to arrest her.

Furthermore, Cortez does not address any circumstances similar to the allegations here that Task Force members kept the children outside in the cold for more than twenty minutes.  Nor do Plaintiffs cite any other case law making such conduct a clearly established Fourth Amendment violation.

For all the foregoing reasons, then, Defendants are entitled to qualified immunity and the Court, therefore, GRANTS them summary judgment on Claims 3, 4, and 5.

### b. Seizing Eduardo Ramirez (Counts 6 and 7)

40

In Count 6, Eduardo alleges that Reddish unreasonably seized him during the April 10 raid.  The evidence indicates that, after Defendants entered A103 and arrested Carmona, she called her son Eduardo, who was in his apartment located in another building in the same apartment complex, and asked him to come get the children she was babysitting before ICE took them.  When Eduardo arrived on scene at A103, Reddish asked him if he had any immigration papers.  Approaching a person in a public place and asking him questions does not, alone, amount to a seizure.  See, e.g., Bostick, 501 U.S. at 434.

Thinking Reddish was asking about a green card, Eduardo responded, "No." (Doc. 184-18, tr. 75.)  Reddish then put Eduardo up against a wall, handcuffed him, and patted him down.  This was a seizure, but a reasonable one at this point because, based on Eduardo's response, Reddish had probable cause to believe he was unlawfully in the United States.  See Cortez, 478 F.3d at 1115 (noting that warrantless arrest is permissible when officer has probable cause to believe individual has committed a crime).  See generally Bailey v. United States, 568 U.S. 186, 192 (2013) (stating "the general rule that Fourth Amendment seizures are reasonable only if based on probable cause to believe that the individual has committed a crime" (quoting Dunaway v. New York, 442 U.S. 200, 213 (1979)).

Ramirez contends that Reddish's question—asking Eduardo if he had any immigration papers—was ambiguous and, therefore, ineffective to create probable cause to believe Eduardo was unlawfully in the United States.  Even if that is so, Eduardo's negative response to that question was sufficient to give Reddish at least

41

"arguable probable cause," which suffices for qualified immunity.  See Stonecipher v. Valles, 759 F.3d 1134, 1141 (10th Cir. 2014) ("Arguable probable cause is another way of saying that the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists.").  But, dispositive here, even if the Court could say that this seizure was unreasonable, Eduardo has failed to identify any relevant case law addressing sufficiently analogous circumstances that would have put an objective officer in Reddish's position on notice that seizing Eduardo under these circumstances violated the Fourth Amendment.

"[A] seizure reasonable at its inception because [it is] based upon probable cause may become unreasonable as a result of its duration or for other reasons."  Segura v. United States, 468 U.S. 796, 812 (1984).  It is doubtful that the scope of this seizure was unreasonable, however.  After handcuffing Eduardo, Agent Reddish went through his wallet and looked at his driver's license.  Eduardo asserts that his protected status under the Deferred Action for Childhood Arrivals ("DACA") program should have been clear when Reddish looked at his driver's license, but Eduardo does not explain why.  In any event, when Eduardo's brothers, Carlos and Abel, Jr., arrived three to five minutes later, they informed Reddish that Eduardo's presence in the United States was protected under DACA.  Reddish eventually unhandcuffed Eduardo.  Eduardo estimated that he was handcuffed for about fifteen minutes.  His mother Carmona and brother Carlos estimated Eduardo was, instead, handcuffed for twenty to thirty minutes. Accepting this evidence as true, Ramirez has failed to identify any relevant case law, clearly established in April 2017, that would have put a reasonable officer in Reddish's

position on notice that the length of Ramirez's detention under these circumstances violated the Fourth Amendment.  Eduardo has thus failed to overcome a qualified immunity defense to the unlawful seizure claim alleged in Count 6.

In Count 7, Eduardo alleges that Reddish used excessive force when the officer seized him.  Specifically, Eduardo challenges Reddish's placing him in handcuffs that were too tight, and then not loosening the handcuffs when Eduardo complained about them.  See Cortez, 478 F.3d at 1129 (recognizing such an excessive force claim where the handcuffs caused actual injury).

"An excessive force claim that includes a challenge to the 'manner or course of handcuffing' requires the plaintiff to show both that 'the force used was more than reasonably necessary' and 'some de minimis actual injury.'"  Donahue, 948 F.3d at 1196 (alterations incorporated) (quoting Fisher v. City of Las Cruces, 584 F.3d 888, 894 (10th Cir. 2009)).  Although Eduardo asserts that he had bruises on his wrists for more than a month, that is not sufficient injury to support an excessive force claim.  See id. at 1197 (holding bruising, but no permanent injury, was insufficient to support excessive force claim premised on handcuffing, citing cases).

Eduardo contends that he need not show actual injury because he is complaining about excessive force that goes beyond just tight handcuffs.  The handcuffing was central to his excessive force claim.  Nonetheless, even if he is also complaining about other force used against him, Eduardo has failed to show an excessive force violation that was clearly established in April 2017.  Eduardo cites to Cortez but, as previously explained, the circumstances the Tenth Circuit addressed in Cortez, are not sufficiently

43

analogous to the circumstances presented here to make Reddish's challenged conduct a clearly established Fourth Amendment excessive force violation.  Reddish, then, is entitled to qualified immunity on the excessive force claim, too.  The Court, therefore, GRANTS Reddish summary judgment on both Counts 6 and 7.

### c. Seizing Berenice Resendiz (Count 8)

Ramirez, Sr.'s daughter-in-law Resendiz alleges that an unidentified officer, John Doe 1, unreasonably seized her when she arrived home from work to take custody of her three children on April 10.  More specifically, Resendiz contends that when she returned to her home, A103, officers would not let her into her apartment.  Even after discovery, however, Resendiz is unable to identify the officer or officers who kept her out of her apartment.  That alone would warrant dismissing this claim.

Nonetheless, Defendants are, in any event, entitled to summary judgment on the merits.  Resendiz has failed to establish that this unidentified officer or officers seized her.  When she arrived home, Resendiz was able to go directly to her children, who were on a grassy area outside the apartment.  She was able to take her children back inside A103 a few minutes later.  Not being allowed into her apartment is not the same as being seized.  See Walker, 451 F.3d at 1149 (distinguishing between seizing someone and excluding them from a crime scene).  However, even if the unidentified officer or officers seized Resendiz for Fourth Amendment purposes, such a seizure arguably would have been reasonable in order to enable officers to control the scene. See id.; Maddox, 388 F.3d at 1361–63; Thompson, 58 F.3d at 1517.

44

But, in any event—and dispositive here—even if the unidentified officer or officers unreasonably seized Resendiz in violation of the Fourth Amendment, she has not identified any relevant case law that clearly established such a constitutional violation under analogous facts as of April 10, 2017.[23]  For all of these reasons, Resendiz has failed to overcome the qualified immunity defense.  The Court, therefore, GRANTS Defendants summary judgment on Count 8.

### d. Seizing Carlos Ramirez and Abel Ramirez, Jr. (Counts 9 and 10)

The evidence indicates that Carlos and his brother Abel, Jr. were preparing to leave work for home on April 10 when they heard from family and later from Reddish that federal agents were at the brothers' apartments, A103 and A104, looking for their father.  Carlos and Abel, Jr. immediately drove home and arrived while the Task Force members were still there.  Both brothers allege that Defendants unreasonably seized them upon their arrival by restricting their movement, asking them questions, and not allowing either brother to return to his apartment or to speak with family members.[24]

---

[23] Resendiz argues that Reddish told her husband Carlos that he had fifteen minutes to get home or his children would be turned over to social services; Reddish knew that Carlos would relay that information to Resendiz; thus, Resendiz's leaving work and driving immediately home amounted to her submitting to Reddish's show of authority; thus Reddish seized her; and this seizure was unreasonable.  First, Resendiz did not specifically assert this claim against Reddish.  But even considering these new allegations made specifically against Reddish, Resendiz has failed to identify any relevant case law that would have clearly established such a Fourth Amendment violation.

[24] Carlos asserts that it was Defendant Reddish who unlawfully seized him, while Abel, Jr. alleges only that several unidentified officers, John Does 1, 5, 13, and 14, seized him.  Abel, Jr's failure, even after discovery, to identify these John Doe defendants would alone warrant dismissing this claim, Count 10.  Abel, Jr. in opposing summary

Approaching a person in a public place and asking him questions does not, alone, amount to a seizure.  See Bostick, 501 U.S. at 434.  Nor does excluding the Ramirez brothers from their apartments.  See Walker, 451 F.3d at 1149.  They are unable to point to any evidence that either brother's movement was restrained to the degree that would amount to a seizure for Fourth Amendment purposes.  See generally Hernandez, 847 F.3d at 1263–64 (providing non-exhaustive list of factors relevant to determine whether a seizure has occurred).  Even if such a seizure occurred, however, it would have been reasonable to control the scene.  See Walker, 451 F.3d at 1149; Maddox, 388 F.3d at 1361–63; Thompson, 58 F.3d at 1517.

Finally, and dispositive here, even if the Court could say that either or both of the brothers were unreasonably seized, Plaintiffs have not identified any relevant case law addressing analogous circumstances that clearly established the Fourth Amendment violations Carlos and Abel, Jr. assert in Counts 9 and 10.  For all of these reasons, Carlos and Abel, Jr. have failed to overcome Defendants qualified immunity defense.  The Court, therefore, GRANTS Defendants summary judgment on these two counts.

### 3. Seizures and force used on April 11

#### a. Seizing Resendiz and her children, J.R. [6], J.R. [4], and J.R. [2] (Counts 14, 15, and 16)

---

judgment, responds that the "[p]leading of Does in Count 10 creates no prejudice to Defendants, where it is clear which specifically named Defendants were present and contributed to the show of authority over Abel, Jr."  (Doc. 195 at 84 n.17.)  But Abel, Jr. still does not identify which "specifically identified Defendants" these John Does are.  In any event, as explained in the text above, Abel, Jr.'s Count 10 fails on its merits to overcome a qualified immunity defense.

46

In Counts 14 and 15, Resendiz and her three children, J.R. [6], J.R. [4], and J.R. [2], contend that various Defendants unreasonably seized them on the evening of April 11.  That night, at 10:00 p.m., Resendiz was watching television in her bedroom, where her three children were sleeping, when she saw a number of officers outside her apartment, A103.  She spoke by phone with her husband Carlos, who was not then at home.  He advised Resendiz to stay in the bedroom and not to open the door.  Resendiz followed his advice, at least initially.  After Task Force members knocked on her door for several minutes, however, Resendiz decided to answer the door.  Before she could do so, however, Defendants used a battering ram to knock the front door down and enter.  Encountering Resendiz in the dark apartment, Defendants pointed their weapons at her and ordered her to put her hands up and come out of the apartment.  She complied.  Officers continued to point their guns at her while she exited the apartment.  Officers brought the children outside a few minutes later.

Task Force members seized these Plaintiffs when they ordered Resendiz out of A103 and soon thereafter brought the children out.  See Storey, 696 F.3d at 993.  But those seizures were arguably reasonable to permit officers to control the scene while searching for Ramirez, Sr., and to insure the officers' and A103 occupants' safety.  See Walker, 451 F.3d at 1149; Maddox, 388 F.3d at 1361–63; Thompson, 58 F.3d at 1517.  In any event, Plaintiffs have not cited any relevant authority clearly establishing that Task Force members conduct violated the Fourth Amendment.

Nor have Plaintiffs shown that the scope of these seizures amounted to a clearly established Fourth Amendment violation.  Resendiz and her children were allowed back

47

inside A103 after 15 minutes or so.  Cf. Walker, 451 F.3d at 1149–50 (holding ninety-minute detention to control crime scene was unreasonable).

In Count 16, Resendiz and her children further allege that all the named Defendants present on April 11, plus John Does 1, 3, 4, 21-23, used excessive force when they seized Resendiz and her children on the night of April 11.  Plaintiffs appear to base this claim primarily on the fact that Defendants knew children were likely to be in A103 that night and yet Defendants briefly pointed their weapons at Resendiz as she exited A103, while her children remained behind her.  It was objectively reasonable, however, for Defendants to point their weapons at whomever they encountered in the darkened apartment until Defendants could determine both who was inside A103 and whether those occupants presented a threat to the officers.  See Lundstrom, 616 F.3d at 1121; Reeves, 484 F.3d at 1260–61.

In any event, even if Plaintiffs have succeeded in asserting violations of the Fourth Amendment, Plaintiffs have again failed to show that any such constitutional violation was clearly established in April 2017.  Plaintiffs contend that the Tenth Circuit, in Holland, "clearly established" that "[p]ointing a firearm directly at a child calls for even greater sensitivity to what may be justified or what may be excessive under all the circumstances," 268 F.3d at 1193.  While Holland set forth that general principle, it did not apply that principle to find a Fourth Amendment violation under circumstances directly analogous to those presented here.  Instead, under circumstances where SWAT team members entering a family compound to execute misdemeanor arrest and search warrants held non-suspect children prone on the ground at gunpoint for ten to fifteen

48

minutes, Holland determined that, "[w]hile the SWAT Team's initial show of force may have been reasonable under the circumstances, continuing to hold the children directly at gunpoint after the officers had gained complete control of the situation . . . was not justified under the circumstances at that point." Id. Those circumstances are not sufficiently analogous to the situation presented here to make Plaintiffs' claimed Fourth Amendment violations alleged here clearly established.

Plaintiffs further argue that it was unreasonable for Task Force members to enter a residence at night to execute an arrest warrant, when officers know there will be children and other non-suspects present. But, again, Plaintiffs fail to identify any relevant cases that clearly established that such conduct, under circumstances similar to those at issue here, would violate the Fourth Amendment.

For all of the foregoing reasons, Plaintiffs have failed to overcome Defendants' qualified immunity defense to these claims. The Court, therefore, GRANTS Defendants summary judgment on Claims 14, 15, and 16.

**b. Seizing Eduardo Ramirez (Counts 18 and 19)**

In Counts 18 and 19, Eduardo alleges that Spencer and John Doe 4 unreasonably seized him and, in doing so, used excessive force against him. Although Eduardo alleges in the complaint that John Doe 4 pointed an assault weapon at him, Eduardo has still not identified John Doe 4 now, after discovery has been completed. Nor has Eduardo pointed to any evidence that any Task Force member pointed a gun at him on April 11.

Eduardo has also failed to point to any evidence that Spencer seized him. Instead, in his opposition to summary judgment, Eduardo only complains about the Task Force members' conduct generally.  But none of the conduct of which he complains amounted to a show of authority that would have "communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." Kaupp, 538 U.S. at 629 ((quoting Bostick, 501 U.S. at 437).  See generally Hernandez, 847 F.3d at 1263–64 (providing non-exhaustive list of factors relevant to determine whether a seizure has occurred).  Eduardo testified at his deposition that, after receiving a call from a family member on April 11 letting him know that Task Force members had returned to A103, Eduardo left his apartment, walked by two Task Force members stationed outside his building, twice denied their requests to search his apartment, walked over to A103 and, on the way, passed a number of armed Task Force members, some of whom were yelling and screaming at him.  None of the Task Force members' challenged conduct deterred Eduardo from walking to A103. Even if Defendants' conduct toward Eduardo amounted to a show of force sufficient to result in seizure, then, Eduardo never submitted to that show of force and thus was never seized as a result of it. See Reeves, 484 F.3d at 1251-53; see also Easley, 911 F.3d at 1080 (noting seizure occurs only if a person submits to an officer's display of authority).

When he arrived at A103, Eduardo testified at his deposition that officers would not let him enter.  But that fact, alone, does not indicate he was seized. See Walker, 451 F.3d at 1149 (distinguishing between seizing someone and excluding them from a

50

crime scene).  Eduardo has presented no evidence that his movement was otherwise curtailed to a degree that would be sufficient to amount to a Fourth Amendment seizure.[25]

Even if refusing to allow Eduardo to enter A103 could be deemed a seizure, however, he has not shown that it was unreasonable.  Rather, such a seizure would have been reasonable to enable officers to control the scene.  See Walker, 451 F.3d at 1149; Maddox, 388 F.3d at 1361–63; Thompson, 58 F.3d at 1517.

Finally, and dispositive here, even if Eduardo was unconstitutionally seized on April 11, he has failed to identify any relevant case law that clearly established any such Fourth Amendment violation by April 2017.

Eduardo goes on to allege that Defendant Spencer used excessive force to seize him when "officers mocked and harassed him."  (Doc. 125 ¶ 288.)  First, there can be no excessive force used in violation of the Fourth Amendment if, as was the case here, Eduardo was never seized.  See Farrell v. Montoya, 878 F.3d 933, 937 (10th Cir. 2017). Next, Eduardo has not established that Spencer, the only individual Defendant named in this count, personally participated in this challenged conduct.  In any event, while not to be condoned, the Tenth Circuit has noted that "it seems unlikely that harsh language alone would render a search or seizure 'unreasonable.'"  Holland, 268 F.3d at 1194. Again—dispositive here, too—even if any of the conduct Ramirez challenges as

---

[25] Furthermore, Eduardo's deposition testimony indicates that the officers who stopped him from entering A103 did not include Spencer who, according to Eduardo, was instead talking with Carlos.  Yet Spencer was the only individual defendant that Counts 18 and 19 included by name.

51

excessive force could be deemed to have violated the Fourth Amendment, Eduardo has failed to identify clearly established case law that would have put Spencer (or any of the individual Defendants) on notice on April 11, 2017, that this challenged conduct was unconstitutional.

For all the foregoing reasons, Counts 18 and 19 fail to overcome Defendants' qualified immunity defense.  The Court, therefore, GRANTS Defendants summary judgment on these counts.

### c. Seizing Abel Ramirez, Jr. (Count 21)

Next, Abel, Jr. alleges that Spencer and John Does 28 and 29 unreasonably seized him on April 11.  At the same time that Task Force members knocked and entered Carlos and Resendiz's apartment, A103, looking to arrest Ramirez, Sr., two officers knocked on the door of A104, Abel, Jr.'s apartment, and, when he answered, ordered him to stand outside the apartment and would not let him close his apartment door.  This was a seizure, but it was arguably reasonable to insure the safety of the Task Force members entering the apartment across the breezeway, A103, where Abel, Jr.'s immediate family members lived.  See Walker, 451 F.3d at 1149; Maddox, 388 F.3d at 1361–63; Thompson, 58 F.3d at 1517.

Even if this amounted to an unreasonable seizure, however, Abel, Jr. has not identified any relevant case law clearly establishing under analogous circumstances that such a seizure violated the Fourth Amendment.  To the contrary, Maddox would have supported officers thinking such a temporary detention was reasonable.  See 388 F.3d at 1361–63.

52

Abel, Jr. does not argue that Defendants unnecessarily prolonged this seizure. And, in fact, the evidence indicates that when his brother Eduardo arrived on the scene, Abel, Jr. walked over and joined him in the parking lot.  For all of these reasons, Abel, Jr. has failed to overcome Defendants' qualified immunity defense and the Court, therefore, GRANTS Defendants summary judgment on Count 21.

### d. Seizing Carlos Ramirez (Count 22)

When Task Force members entered his apartment on April 11, Carlos was not home.  He arrived soon thereafter.  In Count 22, Carlos alleges that Reddish unreasonably seized him when Carlos drove up and parked in front of his apartment because Task Force members at that time pointed their weapons at him, then "Reddish approached Carlos as he got out of his car, refused to let him speak to [his wife Resendiz] or the other family members, and interrogated him."  (Doc. 125 ¶ 302.) Simply approaching a person in a public place and asking him questions does not, alone, amount to a seizure.  See Bostick, 501 U.S. at 434.  But pointing weapons at someone can amount to a seizure.  See Kaupp, 538 U.S. at 629 (addressing factors that can indicate a seizure).  Any brief seizure here, however, was arguably reasonable to allow officers to control the scene and insure their safety.  See Walker, 451 F.3d at 1149; Maddox, 388 F.3d at 1361–63; Thompson, 58 F.3d at 1517.  Furthermore, Carlos does not argue that Reddish unnecessarily prolonged his seizure.

Even if Reddish (or any other officers) unreasonably seized Carlos, however, Carlos has not identified any relevant case law that would have placed Defendants on notice that a brief detention under these circumstances violated clearly established

Fourth Amendment rights.  The Court, therefore, GRANTS Defendants summary judgment on Count 22.

### e.  Manner of effecting these seizures (Count 20)

Count 20 alleges that on April 11 Defendants Spencer, Reddish, and John Doe 4 used "curse words and harsh language," as well as loud voices, in an effort "to scare and intimidate" Plaintiffs.  (Doc. 125 ¶¶ 292–96.)  In their opposition to summary judgment, Plaintiffs identify John Doe 4 as Defendant Golding and specify that this claim is based on the recorded conversation that these three Defendants had with Carlos and Resendiz in their apartment, after the Task Force failed to find Ramirez, Sr.  According to these Plaintiffs, this claim is not only supported by the foul language that these Defendants used during this conversation, which occurred in front of three small children, but also the message that Defendants conveyed—that the family threw their mother, Carmona, "to the wolves"; she was so scared she could not tell Reddish the names of her parents; the family would never be able to save Carmona from "ICE and Trump's new law"; and that they would be bankrupted trying.  (Doc. 195 at 103–04.)

Such conduct is certainly part of the totality of circumstances a court must consider in determining whether a challenged seizure was reasonable.  See Holland, 268 F.3d at 1194.  But there is no evidence that either Carlos or Resendiz was seized when this conversation took place.  Even assuming Carlos and Resendiz were seized, however, the Tenth Circuit has noted that "it seems unlikely that harsh language alone would render a search or seizure 'unreasonable.'"  Id.  In any event, even if Carlos and Resendiz established that they were unreasonably seized in this manner in violation of

the Fourth Amendment, they have not cited any relevant case law that made any such constitutional violation clearly established by April 11, 2017.  While Plaintiffs correctly cite Holland for the general proposition that the Fourth Amendment protects an individual's "sense of security and individual dignity," 268 F.3d at 1195, they fail to cite any relevant case law addressing circumstances sufficiently analogous to those presented here that would clearly establish the Fourth Amendment violation they claim in Count 20. The Court, therefore, GRANTS Defendants summary judgment on Count 20, as well.

**C. Remaining claims against the individual Defendants (Counts 12 and 23)**

Plaintiffs have abandoned their two remaining claims against the individual Defendants by failing to address those claims at all in their opposition to summary judgment.  See Jones v. Rent-A-Center, Inc., 240 F. Supp. 2d 1167, 1175 (D. Kan. 2002).  Defendants are, in any event, entitled to qualified immunity on both of these claims.

In Count 12, Plaintiffs alleged that Defendants Reddish and John Does 1, 5-12, and 15-17 took—stole—$3,500 belonging to Carmona from A103 on either April 10 or 11.  The Court agrees with Defendants that Plaintiffs have failed to provide sufficient evidence to support this claim.

In addition to their Bivens claims, Plaintiffs, in Count 23, asserted a cause of action under 42 U.S.C. § 1985(3) alleging that the individual Defendants unlawfully conspired to deprive Plaintiffs of their Fourth Amendment protections.  Defendants contend they are entitled to qualified immunity on that claim, too.  See Ziglar, 137 S. Ct.

at 1867-69 (granting federal agents qualified immunity on § 1985(3) claims).  Because

Plaintiffs did not address this § 1985(3) claim in their opposition to summary judgment,

they have not attempted to meet their "heavy two-part burden" of overcoming

Defendants' qualified immunity defense, McCowan, 945 F.3d at 1282 (quoting Estate of

Ceballos, 919 F.3d at 1212).  Moreover, the Court agrees with Defendants that, at the

first step of the qualified immunity analysis, Plaintiffs failed to assert sufficient evidence

of such a conspiracy.  In addition, at the second qualified immunity inquiry, the Supreme

Court has not yet decided whether federal agents in the same agency or department

can conspire with one another for purposes of violating § 1985(3).  See Ziglar, 137

S. Ct. at 1867–69.  Defendants, then, are entitled to qualified immunity from this

conspiracy claim, Count 23.

The Court, therefore, GRANTS the individual Defendants summary judgment on

Counts 12 and 23.

### III. FEDERAL TORT CLAIMS ACT CLAIMS (Counts 24-33)

Plaintiffs also assert ten claims against the United States under the Federal Tort

Claims Act ("FTCA"), 28 U.S.C. §§ 2671-80, 1346(b)(1).  The United States, however,

can only be sued to the extent it has waived its sovereign immunity.  See Garling v. U.S.

Envtl. Prot. Agency, 849 F.3d 1289, 1294 (10th Cir. 2017) (citing cases).  "[T]he FTCA

waives sovereign immunity for certain state law tort claims against the United States,"

id., including claims

> for money damages . . . for injury or loss of property, or personal injury or
> death caused by the negligent or wrongful act or omission of any employee
> of the Government while acting within the scope of his office or employment,
> under circumstances where the United States, if a private person, would be

liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1); see also id. § 2674.  The FTCA, however, does "not assure injured persons damages for all injuries caused by [federal] employees."  Dalehite v. United States, 346 U.S. 15, 17 (1953), abrogation on other grounds recognized in Rayonier, Inc. v. United States, 352 U.S. 315, 317–19 (1957).  Relevant here, the FTCA includes a number of exceptions to its sovereign immunity waiver.  See 28 U.S.C. § 2680.  When an exception applies to a claim, the United States retains its sovereign immunity and a federal court, thus, lacks subject matter jurisdiction over that claim.  See Garling, 849 F.3d at 1294.  It is Plaintiffs' burden to establish subject matter jurisdiction, which includes, in an FTCA action, showing that the United States has waived its sovereign immunity.  See Garcia v. U.S. Air Force, 533 F.3d 1170, 1175 (10th Cir. 2008).

## A. Claims for violating the Utah Constitution (Counts 32 and 33)

While the FTCA waives the United States' sovereign immunity for state law tort claims, see Garling, 849 F.3d at 1294, two of Plaintiffs' FTCA claims at issue here seek to recover from the United States instead for Task Force members' violations of the Utah Constitution.  Specifically, in Counts 32 and 33, Plaintiffs allege that Task Force members violated Article 1, Section 14 of the Utah Constitution, which provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated"; and Article 1, Section 9, which provides that "[p]ersons arrested or imprisoned shall not be treated with unnecessary rigor."

Plaintiffs, however, have failed to establish that the FTCA waives the United

States' sovereign immunity from these claims.  Courts generally have held that the

FTCA does not waive the United States' sovereign immunity from liability for its

employees' violations of state constitutions.  See Webb v. Smith, No. Civ. 15-213-DLR,

2016 WL 7666119, at *1 (D. Utah Jan. 22, 2016) ("The United States has not waived its

sovereign immunity for it and its officers to be sued for damages under the Utah

Constitution.") (unreported), aff'd, 656 F. App'x 414 (10th Cir. July 25, 2016)

(unpublished).[26]

Moreover, the FTCA expressly waives sovereign immunity for the United States'

liability for state law "tort claims[] in the same manner and to the same extent as a

private individual under like circumstances."  28 U.S.C. § 2674.  See generally Daniel A.

Morris, Fed. Tort Claims, § 1:2 (updated June 2019) (stating failure to establish

---

[26] See also Hernandez v. United States, 939 F.3d 191, 204–05 (2d Cir. 2019)
(concluding United States had not waived sovereign immunity for FTCA claim that
federal employees violated New York Constitution's due process clause); Doan v.
Bergeron, No. 15-cv-11725-IT, 2016 WL 5346935, at *9 & n.10 (D. Mass. Sept. 23,
2016) (unreported) (stating, in rejecting FTCA claim, that plaintiff made no showing that
United States had waived sovereign immunity for claims alleging the violation of state
constitution); Stout v. Okla. ex rel. Okla. Highway Patrol, Nos. 13-cv-753-WPJ, 14-cv-
427-WPJ, 2015 WL 127820, at *8 (W.D. Okla. Jan. 6, 2015) (unreported) (stating FTCA
does not waive sovereign immunity for claims alleging the violation of either federal or
state constitution); Schmidt v. United States, No. 2:09-cv-0660 LKK GGH PS, 2013 WL
5492311, at *3 n.4 (E.D. Cal. Oct. 2, 2013) (unreported) ("[S]tate constitutional
violations are not cognizable under the FTCA; however, the facts underlying such
claims may also be potentially cognizable state law statutory or common law torts as
well."), adopted, 2014 WL 576196 (E.D. Cal. 2014); Rich v. United States, 158
F. Supp. 2d 619, 630 (D. Md. 2001) (holding FTCA plaintiffs failed to show United
States waived sovereign immunity for state constitutional claims).  See generally
Franklin Sav. Corp. v. United States, 180 F.3d 1124, 1139 (10th Cir. 1999) (noting
FTCA waives sovereign immunity for "garden-variety common-law torts").

analogous private liability is jurisdictional defect under FTCA).  But the two state

constitutional provisions Plaintiffs invoke here are aimed at state actors (e.g. public

employees), not private individuals.  See Schroeder v. Utah Att'y Gen.'s Office, 358

P.3d 1075, 1077 (Utah 2015) (stating that "Article 1, Section 14 of the Utah Constitution

prohibits state actors from conducting unreasonable searches and seizures"); Bott v.

DeLand, 922 P.2d 732, 739–40 (Utah 1996) (recognizing claims for damages against

state actors for violating Article I, Section 9 because state employees "have a unique

capacity to harm which private individuals do not have"), abrogated on other grounds,

Spackman ex rel. Spackman v. Bd. of Educ. of the Box Elder Cty. Sch. Dist., 16 P.3d

533, 537–39 (Utah 2000).  Plaintiffs have not shown that a private individual would be

liable under Utah law for the two state constitutional violations Plaintiffs assert here

against the United States.  See Appolon v. United States, No. 16-cv-2275 (SJ) (SMB),

2017 WL 3994925, at * 15 (E.D.N.Y. Sept. 6, 2017) (unreported) (stating that "[c]ourts

are required to 'look to the state-law liability of private entities, not to that of public

entities, when assessing the Government's liability under the FTCA even in the

performance of activities private persons do not perform'" (quoting Liranzo v. United

States, 690 F.3d 78, 86 (2d Cir. 2012)).[27]

---

[27] See also United States v. Olson, 546 U.S. 43, 45–46 (2005); Villarruel v. United
States, No. 16-CV-2885-CAB-BGS, 2017 WL 2733930, at *10 (S.D. Cal. June 26, 2017)
(unreported); Muhammad v. United States, 884 F. Supp. 2d 306, 314–15 (E.D. Pa.
2012); Stan's Pharmacy, Inc. v. U.S. Dep't of Health & Human Servs., No. CV 209-137,
2010 WL 11613524, at *3 (S.D. Ga. Dec. 9, 2010) (unreported).

This distinguishes the Utah constitutional violations at issue here from the FTCA claims at issue in Solis-Alarcon v. United States, 432 F. Supp. 2d 236, 251 (D.P.R. 2006), one of the cases on which Plaintiffs rely.  Solis-Alarcon recognized an FTCA claim for the violation of Puerto Rico's constitution, noting "that Puerto Rico law allows the filing of tort claims for violations of the rights protected by its Constitution, such as the right to privacy," citing Robles-Vasquez v. Tirado Garcia, 110 F.3d 204, 208 (1st Cir. 1997).  Robles-Vasquez, in turn, explained that the Puerto Rico Constitution's right to privacy can be enforced even in an action between private parties.  110 F.3d at 207–08; see also Villarruel, 2017 WL 2733930, at *10 (S.D. Cal.) (holding plaintiff could assert FTCA claim for violation of California Constitution's right to privacy because private individuals can be held liable for violating that provision of the state's constitution).  Plaintiffs have not shown that the same is true for the provisions of the Utah Constitution they invoke here.

The other cases on which Plaintiffs rely are also unconvincing.  Plaintiffs cite, for example, to cases stating that "state constitutional claims are included with state law claims subject to the provisions of the FTCA," before concluding that there was some other reason why a federal court could not adjudicate those claims.  See Belton v. Wydra, No. 3:17 CV 2006 (KAD), 2019 WL 2162718, at *15–*16 (D. Conn. May 17, 2019) (holding court lacked jurisdiction because plaintiff failed to exhaust administrative remedies as FTCA requires)[28]; see also Papa v. United States, 281 F. 3d 1004, 1010

---

[28] See Gottesfeld v. Anderson, No. 18 Civ. 10836 (PGG), 2020 WL 1082590, at *12 (S.D. N.Y. Mar. 6, 2020).

n.20, 1011 (9th Cir. 2002) (treating claim against the United States for violations of state constitution as FTCA claim, but then holding that all FTCA claims asserted in that case were time-barred); Rodriguez v. Kwok, No. C 13-04976 SI, 2014 WL 889570, at *4 (N.D. Cal. Mar. 3, 2014) (unreported) (stating FTCA applies to state constitutional claims, but holding plaintiff could not recover under FTCA for violation of California Constitution's due process clause because California did not recognize private cause of action for damages for such a claim).

Plaintiffs, then, have failed to establish that the United States has waived its sovereign immunity from liability for the violations of the Utah Constitution that they assert here.  The Court, therefore, DISMISSES Counts 32 and 33 without prejudice for lack of subject matter jurisdiction.  See Garling, 849 F.3d at 1292 (dismissing FTCA claims for lack of subject matter jurisdiction because FTCA did not waive United States' sovereign immunity for claims asserted in that action); Barnes v. United States, 776 F.3d 1134, 1151–52 (10th Cir. 2015) (holding dismissal of FTCA claim for lack of subject matter jurisdiction should be without prejudice).

## B. Claims barred by the discretionary function exception (Counts 24-26, 29-31)

The United States asserts that this Court also lacks subject matter jurisdiction to consider Counts 24 through 26 and 29 through 31 because those claims fall within the FTCA's discretionary function exception to its waiver of sovereign immunity.  See 28 U.S.C. § 2680(a).

### 1.  The discretionary function exception and its relationship to the "law enforcement proviso"

As a starting point in considering the Court's jurisdiction over these claims, the FTCA generally retains sovereign immunity from, and thus, this Court lacks jurisdiction over, specified intentional torts committed by federal employees.  See 28 U.S.C. § 2680(h).  But the United States has waived its immunity "with regard to acts or omissions of investigative or law enforcement officers of the United States Government," for "any claim arising . . . out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution."  Id.  This particular FTCA waiver of sovereign immunity is called the "law enforcement proviso."  Millbrook v. United States, 569 U.S. 50, 52–53 (2013).  Task Force members here qualify as "investigative or law enforcement officers" because they are "empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law," 28 U.S.C. § 2680(h).  The law enforcement proviso, then, might initially appear to give the Court jurisdiction over at least the assault and battery claims Plaintiffs assert here, Counts 30 and 31.

Even so, the United States argues that the "discretionary function exception," 28 U.S.C. § 2680(a), precludes this Court from exercising jurisdiction over Plaintiffs' assault and battery claims.  Most circuits agree with the United States that, for a court to have jurisdiction over an FTCA claim that falls under the law enforcement proviso, that claim must also avoid the discretionary function exception.  See Linder v. United States, 937 F.3d 1087, 1088-89 (7th Cir. 2019) (joining the Fourth, Fifth, Ninth, and D.C. Circuits), petition for cert. filed, (U.S. Mar. 4, 2020) (No. 19-1082).  But see Nguyen v. United States, 556 F.3d 1244, 1256-57 (11th Cir. 2009) (holding discretionary function

exception cannot override jurisdiction provided by law enforcement proviso).[29]  The

Court is persuaded by the circuit majority.  Plaintiffs make no argument to the contrary.

Plaintiffs, therefore, must establish that the discretionary function exception does not

apply here and thus does not preclude this Court's jurisdiction to consider their assault

and battery claims (Counts 30 and 31), along with the other FTCA claims that the

United States asserts fall under the discretionary function exception, Counts 24, 25, 26,

and 29.  See Hardscrabble Ranch, LLC v. United States, 840 F.3d 1216, 1220 (10th Cir.

2016).

### 2.  The discretionary function exception bars Counts 24-26, 29-31

Through the discretionary function exception the United States retains its

sovereign immunity from, and thus this Court lacks jurisdiction to consider, "[a]ny

[FTCA] claim . . . based upon the exercise or performance or failure to exercise or

perform a discretionary function or duty on the part of a federal agency or an employee

of the Government, whether or not the discretion involved be abused."  28 U.S.C.

§ 2680(a).  The purpose of this exception "is to 'prevent judicial "second-guessing" of

legislative and administrative decisions grounded in social, economic, and political

policy through the medium of an action in tort.'"  United States v. Gaubert, 499 U.S. 315,

323 (1991) (quoting United States v. S.A. Empresa de Viacao Aerea Rio Grandense

(Varig Airlines), 467 U.S. 797, 814 (1984)).  "[W]hen properly construed, the exception

'protects only governmental actions and decisions based on considerations of public

---

[29] The Tenth Circuit has recognized this circuit conflict, but has not yet weighed in.  See
Garling, 849 F.3d at 1298 n.5.

policy.'" Id. (quoting Berkovitz ex rel. Berkovitz v. United States, 486 U.S. 531, 537

(1988)).  This exception, then, is designed to avoid judicial intervention in policy

decisions, see Varig Airlines, 467 U.S. at 820, as well as furthering Congress's general

purpose of using FTCA exceptions "to protect the Government from liability that would

seriously handicap efficient government operations," id. at 814 (quoting United States v.

Muniz, 374 U.S. 150, 163 (1963)).[30]

In determining whether the discretionary function exception applies, the Court

focuses on "the nature of the conduct, rather than the status of the actor."  Gaubert, 499

U.S. at 322 (quoting Varig Airlines, 467 U.S. at 813).

> To determine whether agency conduct falls within the exception, we apply
> a two-part test. See Garcia v. U.S. Air Force, 533 F.3d [at] 1176 (10th Cir.
> 2008) (citing Berkovitz v. United States, 486 U.S. [at] 536). First, we
> determine whether the conduct was discretionary—whether it was "a matter
> of judgment or choice for the acting employee." Id. (quotations omitted).
> "Conduct is not discretionary if a federal statute, regulation, or policy
> specifically prescribes a course of action for an employee to follow. In this
> event, the employee has no rightful option but to adhere to the directive."
> Id. (quotations omitted). Second, if the conduct was discretionary, we
> consider whether it required the "exercise of judgment based on
> considerations of public policy." Id. If both elements are met, the
> governmental conduct is protected as a discretionary function, and
> sovereign immunity bars a claim that involves such conduct. Id.

Garling, 849 F.3d at 1295.  Because application of FTCA exceptions is jurisdictional,

Plaintiffs bear the burden of proving that the discretionary function exception does not

---

[30] When applied to cases like this, involving challenges to actions of federal law
enforcement officers executing an arrest warrant, the discretionary function exception
may also serve another general purpose of FTCA exceptions, to protect the United
States from excessive or fraudulent claims, see Kosak v. United States, 465 U.S. 848,
858 (1984).  The potential number of claims (justified or not) that might be filed against
the federal government based on alleged state law violations during the execution of
arrest and search warrants could be enormous.

apply here to preclude this Court's jurisdiction.  See Hardscrabble Ranch, 840 F.3d at 1220.

To meet this burden, then, Plaintiffs "[f]irst . . . must show that the action [they challenge] was not 'a matter of choice for the'" Task Force members, but instead that their course of action in executing the arrest warrant for Ramirez, Sr. was specifically prescribed by "a federal statute, regulation, or policy."  Garling, 849 F.3d at 1295 (quoting Berkovitz, 486 U.S. at 536).  It makes sense to hold the United States fiscally responsible for harm caused by a wrongful act that is specifically mandated by a federal statute, regulation, or policy, in the same manner and to the same extent as a private individual under like circumstances, subject, of course, to the other limitations in the Federal Tort Claims Act.

But Plaintiffs fail to identify any federal statute, regulation or policy that specifically prescribed the course of action Task Force members should have taken in seeking to execute the arrest warrant for Ramirez, Sr.  Instead, in a brief paragraph in their opposition to summary judgment, Plaintiffs perfunctorily assert only that "[u]nconstitutional conduct necessarily fails Berkovitz's first prong because no policy can grant federal employees the discretion to violate the Constitution."  (Doc. 195 at 107.)

This misstates the critical nature of the first discretionary function inquiry.  That discretionary function inquiry is not whether federal law grants an employee affirmative "discretion to violate the Constitution," nor does it focus on the legal consequences of the action involved.  Instead, this first discretionary function inquiry is a simple binary test focused on whether the conduct at issue in a given case involved a federal

65

employee's exercise of discretion or was, instead, specifically mandated by federal statute, regulation, or policy such that the federal officer really had no discretion as to how to act—at least with regard to his challenged conduct.  Here, the relevant binary inquiry is whether Task Force members had discretion to determine how to execute the arrest warrant for Ramirez, Sr. or whether, instead, their course of action for executing that warrant was prescribed by "a federal statute, regulation, or policy."  Berkovitz, 486 U.S. at 536; see also Gaubert, 499 U.S. at 322.[31]

Plaintiffs have utterly failed to address that question.  Instead, they seek to replace it with a completely different question: whether the Task Force's conduct underlying Plaintiffs' FCTA state law tort claims was unconstitutional.  There is nothing in the language of the discretionary function exception that suggests that that is the relevant inquiry, rather than the two-part test already firmly established by the Supreme Court.

Nor would such a constitutional inquiry into the consequences of the challenged conduct further the purposes served by the discretionary function exception.  Congress intended that this exception "'prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the

---

[31] The Court notes that the Supreme Court has consistently focused this first inquiry on whether there is "a federal statute, regulation, or policy" that prescribed the course of action a federal employee had to take in a given situation.  See Gaubert, 499 U.S. at 322; Berkovitz, 486 U.S. at 536.  Doing so sets up the second inquiry, whether any discretion is grounded in public policy, see Gaubert, 499 U.S. at 323; Garling, 849 F.3d at 1295.

medium of an action in tort.'" <u>Gaubert</u>, 499 U.S. at 323 (quoting <u>Varig Airlines</u>, 467 U.S. at 814).  If the federal employee was exercising discretion that was grounded in public policy considerations, the discretionary function exception applies, "whether or not the discretion involved be abused."[32].  28 U.S.C. § 2680(a).  So application of the discretionary function exception expressly does not turn on an analysis of whether, in a given case, the federal employee abused his or her discretion (by acting unconstitutionally or otherwise).  It would make no sense that application of this discretionary function exception to the FTCA's waiver of sovereign immunity would require an analysis of whether the federal employee's conduct was unconstitutional, a very different inquiry than whether the challenged conduct involved the exercise of discretion.  Moreover, such a determination of whether the employee acted unconstitutionally in a given case would typically require a full-blown examination of the federal employee's conduct that the discretionary function exception is designed to avoid.[33]

---

[32] Plaintiffs argue that the Task Force members had no discretion to act unconstitutionally but Plaintiffs misunderstand the test.  The Task Force members might have abused their discretion by acting unconstitutionally but that does not negate the fact that the manner in which an arrest warrant is executed involves a great deal of discretion.  28 U.S.C. § 2680(a) specifically does not limit the assertion of sovereign immunity only to acts that are constitutional.

[33] Stated another way, Plaintiffs' reading of the discretionary function exception would render it largely a nullity—granting the United States immunity only after a full-blown examination of the federal employee's conduct before the court would be able to determine whether the challenged actions were constitutional.  As mentioned above, that inquiry will often substantially overlap with the merits of the state tort claims being asserted and that means that the determination of whether the discretionary function exception applies to deprive the court of subject matter jurisdiction could not occur until the litigation on the merits of an FTCA claim was complete.

For example, in this case, if the facts are as asserted by the individual Defendants, their conduct was likely constitutional and there should be no waiver of sovereign immunity.  On the other hand, if the facts are as asserted by Plaintiffs, there may be aspects of the officers' conduct that was unconstitutional.  The Fourth Amendment proscribes "objectively unreasonable" searches and seizures.  See Graham, 490 U.S. at 397.  Application of that standard will typically require a lengthy and detailed analysis, as the first part of this order illustrates.  To make this a predicate first stage issue to determine whether or not the United States has even waived its sovereign immunity would make no sense whatsoever.

Application of the discretionary function exception is a determination of subject matter jurisdiction to be made at the outset of the FTCA litigation.  This Court declines, without explicit congressional, Supreme Court, or Tenth Circuit direction, to superimpose such an involved and detailed analysis of the constitutionality of the federal employee's conduct challenged under the FTCA into the otherwise straightforward inquiry that § 2680(a) and the Supreme Court have prescribed for determining whether the discretionary function exception should apply: (1) were the officers' actions discretionary under the relevant federal statutes, regulations, or policies and (2) did that action involve public policy.  Neither the language of the discretionary function exception nor its purposes support imposing an additional preliminary constitutional analysis.  See Dalehite, 346 U.S. at 30–31 (stating that, in interpreting FTCA exceptions, courts may "include only those circumstances which are within the words and reason of the exception" because FTCA plaintiffs "obtain their right to sue

68

from Congress (and they) necessarily must take (that right) subject to such restrictions as have been imposed" by Congress (citation omitted)).

Plaintiffs do not cite to any Supreme Court authority requiring such an involved constitutional inquiry.  The Supreme Court, instead, applies the discretionary function exception in a much more straightforward manner, asking only whether the nature of the federal employee's conduct at issue involved his exercise of judgment or discretion based on public policy or instead whether that employee's course of action was prescribed by "a federal statute, regulation, or policy."  Berkovitz, 486 U.S. at 536.  Such a straightforward, binary determination is much more logically suited for a determination of subject matter jurisdiction.  In conducting that initial jurisdictional determination, the Court need never get to the point of considering ramifications of the challenged conduct—that is, whether it was constitutional or not, or whether the federal employee abused any discretion he may have had, which in this case would overlap with the matters to be determined at trial.

The Seventh Circuit reached a similar conclusion when it applied the discretionary function exception to conduct that involved a federal employee's "exercise of discretion, albeit constitutionally repugnant, and therefore excepted [a] claim from the reach of the [FTCA]."  Kiiskila v. United States, 466 F.2d 626, 627–28 (7th Cir. 1972). The Seventh Circuit noted that "the theme that 'no one has discretion to violate the Constitution' has nothing to do with the Federal Tort Claims Act, which does not apply to constitutional violations."  Linder, 937 F.3d at 1090; see also FDIC v. Meyer, 510 U.S. 471, 477–78 (1994) (holding that federal constitutional violation could not be the basis

69

of an FTCA claim, which must, by definition, be based on state tort law and for which the United States is liable to the same extent as a private person).

Plaintiffs rely on the D.C. Circuit's decision in Loumiet v. United States, 828 F.3d 936, 943 (D.C. Cir. 2016). In Loumiet, after determining that the federal agency's challenged decision to initiate an administrative enforcement action was generally subject to the discretionary function exception, the D.C. Circuit went on to conclude that the discretionary function exception, nevertheless, does not "immunize[] allegedly unconstitutional abuses of discretion by the government." Id. at 944. That conclusion is flawed for several reasons. First, it conflates the initial issue of whether the United States has waived sovereign immunity with a question of the constitutionality of the challenged act itself. Instead, the starting place is to determine whether the United States is immune from suit because only Congress (and not the courts) can waive sovereign immunity. See Governor of Kansas v. Kempthorne, 516 F.3d 833, 844 (10th Cir. 2008). So, a court needs to ask what conditions Congress placed on its waiver of sovereign immunity. Congress, through the FTCA's discretionary function exception, has not waived the United States' sovereign immunity for a federal employee's state torts stemming from his exercise of discretion based on public policy considerations, even if the federal employee abused his discretion (which would of course include unconstitutional acts).

Second, Loumiet's holding that the discretionary function exception does not apply to unconstitutional conduct does not stem from the express terms of the exception itself, but instead injects judicial gloss into an exception to the FTCA's waiver of

sovereign immunity, something which lies solely within the discretion of Congress. Congress has absolute authority to retain sovereign immunity for the unconstitutional acts of its agents or to waive sovereign immunity only according to the terms it has chosen, no matter how repugnant that unconstitutional conduct might be to the courts.

Third, Loumiet's holding ignores the incongruity that Congress has explicitly declined to waive the United States' sovereign immunity under the FTCA for claims alleging federal constitutional violations.  See Meyer, 510 U.S. at 477–78.  The gloss adopted by the D.C. Circuit in Loumiet would however invoke the unconstitutional nature of the agent's conduct to trigger waiver of sovereign immunity for the United States to face state tort claims (which often will overlap U.S. Constitutional standards). Surely if that had been Congress' intent, it would have said so explicitly.

Lastly, Loumiet requires an in-depth and nuanced analysis of the employee's underlying conduct, so long as the FTCA plaintiff "plausibly alleges" that the conduct at issue is unconstitutional.  828 F.3d at 843.  Given the very broad language of the federal constitution's protections, it would be a simple matter for any FTCA plaintiff, in almost every case, to avoid the discretionary function exception by making a plausible allegation that a federal employee's tortious conduct was also unconstitutional.  See Castro v. United States, 560 F.3d 381, 394 (5th Cir. 2009) (Smith, J., dissenting) (stating that the majority's holding in that case that federal agents' unconstitutional conduct precluded application of discretionary function exception meant that, "by a plaintiff's artful pleading, the United States can be liable whenever the Constitution is violated even though, under Meyer[, 510 U.S. at 471], the sovereign is not subject to

71

liability for constitutional torts" under the FTCA), reh'g on banc, 608 F.3d 266 (5th Cir. 2010).

Loumiet reached this odd conclusion apparently for two reasons.  First, Loumiet primarily appears to have concluded that a federal employee exercising policy-based discretion has no authority to exercise that discretion in an unconstitutional manner and, thus, his conduct is ultra vires when he acts unconstitutionally.  828 F.3d at 944–45.  To reach that conclusion, Loumiet states: "Although the discretionary-function exception shields government policymakers' lawful discretion to set social, economic, and political policy priorities from judicial second-guessing via tort law, there is no blanket exception for discretion that exceeds constitutional bounds."  Id. at 944 (emphasis added).  But the language of the discretionary function exception does not require analysis into whether the federal employee abused his or her discretion or acted lawfully or unlawfully.  Loumiet itself adds this requirement.  But that contradicts the express language of the exception, which applies regardless of whether the federal employee abused his discretion.

Secondly, Loumiet also appears to have been influenced by several cases from other circuits that stated that a federal employee does not have any discretion when his course of action violates the federal constitution.  However, in several of those cases the language was just dicta.  In several others there was no meaningful analysis of the issue or of the consequences of such a rule.  In one, there was a vigorous dissent.  In another, the decision was based on a previous case that was later overruled.

Predictably, several of those cases could not determine, without further factual development, whether the discretionary function exception should apply.

While the Supreme Court has consistently stated that a "federal statute, regulation, or policy" that prescribes a federal employee's course of action in a given situation eliminates any need for the employee to exercise his own judgment or discretion, the Court has never included the federal constitution as a possible source mandating a course of action. See Castro, 560 F.3d at 393 (5th Cir.) (Smith, J., dissenting) (stating that "[t]he omission of '"Constitution"' from the [Supreme] Court's explicit list of sources that can create a '"mandate"' that nullifies the discretionary function exception should be dispositive here"). That is logical because a "federal statute, regulation, or policy" is likely to state clearly a required course of action and one based on public policy. Not so the federal constitution, whose application in a given situation is often fraught with uncertainty and nuance. Fortunately that is not the determination a court must make before deciding whether the discretionary function exception precludes subject matter jurisdiction over an FTCA claim. Instead, applying that exception as Congress wrote it, the Court need only decide if the conduct at issue in an FTCA claim involves a federal employee exercising discretion based on public policy. If so, the United States has not waived its sovereign immunity from such a claim.

Finally, Loumiet itself evidenced discomfort with its ruling, suggesting the possibility that only conduct that was already clearly established to be unconstitutional might preclude application of the discretionary function exception. That approach is

73

similarly untethered to the language chosen by Congress as to when it will waive sovereign immunity for the discretionary acts of its employees. It also injects a very complex and uncertain analysis at the sovereign immunity stage of determining whether certain conduct—not yet proven—is or is not clearly established.

For all the reasons stated above, the Court concludes that there is no need to analyze the constitutionality of a federal employee's conduct before applying the discretionary function exception. Instead, when deciding whether to apply the discretionary function exception, the Court need only conduct the straightforward, two-part inquiry the Supreme Court has established, asking (1) whether the conduct at issue was left to the federal employee's discretion or, instead, whether a federal statute, regulation, or policy prescribed the course of conduct required; and, if the federal employee was exercising his discretion, (2) whether it was discretion based on public policy concerns. See Garling, 849 F.3d at 1295 (applying Berkovitz). It is Plaintiffs' burden to make both showings in order to avoid application of the discretionary function exception to deprive this Court of subject matter jurisdiction over an FTCA claim. See Hardscrabble Ranch, 840 F.3d at 1220. Plaintiffs in this case have not met that burden. That resolves the application of the discretionary function exception here. It applies to preclude this Court's subject matter jurisdiction over Counts 24 through 26, and 29 through 31. For that reason, the Court DISMISSES these claims without prejudice. See Garling, 849 F.3d at 1292; Barnes, 776 F.3d at 1151–52.

The Court further notes that Plaintiffs asserted only that the federal constitution eliminated any discretion Task Force members had to execute the arrest warrant for

74

Ramirez, Sr. by entering apartments A103 and A104.  Plaintiffs do not identify any

federal statute, regulation or policy that might have effectively prescribed Task Force

members' course of action in executing the arrest warrant.  Even if the Court were to

address that possibility, the discretionary function exception would still apply because

the Task Force members' challenged conduct—executing an arrest warrant—clearly

involved the exercise of discretion and judgment that was based on policy

considerations.  See Mesa v. United States, 123 F.3d 1435, 1438 (11th Cir. 1997).  The

district court in Mesa noted that federal agents executing an arrest warrant

> must answer such basic questions rooted in the investigative process as
> these: shall the warrant be executed at day, or at night? Shall it be executed
> inside a house, or only when the subject is found outdoors? How much
> investigative effort shall be expended prior to executing a warrant? Which
> resources shall be devoted to the task? Profoundly difficult policy and
> judgment choices are often attendant to the process of executing a warrant.

Mesa v. United States, 837 F. Supp. 1210, 1213 (S.D. Fla. 1993).  In affirming the

Southern District of Florida's decision in Mesa, the Eleventh Circuit elaborated further:

> The decision as to how to locate and identify the subject of an arrest warrant
> prior to service of the warrant is susceptible to policy analysis. For example,
> in deciding how extensively to investigate the location and identity of the
> subject, agents may weigh the urgency of apprehending the subject in light
> of such factors as the potential threat that the subject poses to public safety and
> the likelihood that the subject may destroy evidence. A desire to keep the
> investigation secret—for tactical reasons, to protect confidential sources, to
> protect the agents involved, or for other reasons—may also factor into the
> decision as to how to locate and identify the subject of a warrant. In addition,
> agents may consider their available resources and decide how to allocate
> those resources among the many investigations for which they are
> responsible. All of these factors indicate that the decision regarding how to
> locate and identify the subject of an arrest warrant is fundamentally rooted
> in policy considerations, and that judicial second-guessing of this decision
> thus is not appropriate. We therefore conclude that the investigation of the
> whereabouts and identity of the subject of an arrest warrant prior to service

75

of the arrest warrant is conduct that falls within the discretionary function exception.

Mesa, 123 F.3d at 1438; see also Milligan v. United States, 670 F.3d 686, 694-95 (6th Cir. 2012).

There are many other additional discretionary, policy-based decisions that federal agents must make pertaining to the execution of an arrest warrant:  How much force is reasonably required under the fast changing facts presented during the attempted execution of the warrant?  How much force or detention is reasonably justified against third parties who may be present in order to secure the premises and ensure public and private safety?  How much evidence is required reasonably to determine that the subject of the warrant lives where the warrant is to be executed and, in fact, is likely to be there at that time?  Of course, if the arresting officers answer these questions in an unconstitutional manner, those individuals may be liable under a Bivens action, but there can be little doubt that they are exercising discretion informed by policy considerations.  Thus, even if such decisions turn out to violate state tort law, the United States has simply not waived its sovereign immunity such that it can be haled into court to defend against discretionary, policy-based decisions by its agents.[34]

---

[34] Even if, contrary to this Court's holding, the discretionary function exception does not apply when federal employees acted unconstitutionally, in this case the only possibly unconstitutional conduct at issue here is Task Force members' three entries into A103 and A104, and their search of those apartments.  The only FTCA claims that might be based on this conduct are Count 29, intrusion into seclusion, a claim based on Task Force members entries into the apartments, and Count 24, intentional infliction of emotional distress based on those purportedly unconstitutional entries.  However, it is the judgment of this Court that any such alleged unconstitutional searches are not sufficiently outrageous to support an intentional infliction of emotional distress under

## C.  Independent contractor exception bars Count 27's negligence claim

In Count 27, Carmona asserted an FTCA claim alleging that she was injured while being detained at the ICE facility in Aurora, Colorado, due to the negligence of those running that facility.  Carmona now concedes that her negligence claim falls under the FTCA's independent contractor exception because the ICE facility is operated by an independent contractor hired by the United States.  See 28 U.S.C. § 2671.  In light of this concession, the Court DISMISSES Count 27 without prejudice for lack of subject matter jurisdiction.  See Garling, 849 F.3d at 1292; Barnes, 776 F.3d at 1151-52.

## D. The detention-of-goods exception bars Count 28's claim for conversion

Lastly, Carmona seeks to recover damages from the United States because Task Force members, while searching A103 for Ramirez, Sr, either intentionally converted or negligently took $3,500 in cash that she kept in a coat pocket in her bedroom closet.  The United States contends that the Court does not have jurisdiction to consider this claim because it falls within the FTCA's detention-of-goods exception.  That exception retains the United States' sovereign immunity for "[a]ny claim arising in respect of . . . the detention of any goods, merchandise, or other property by any officer of customs, or excise or any other law enforcement officer."  28 U.S.C. § 2680(c) (also setting forth exceptions not relevant here).  Plaintiffs have failed to show that this claim does not fall within the detention-of-goods exception.

---

Utah law.  So even if a federal employee's unconstitutional conduct could preclude application of the discretionary function exception, that would include, in this case, at most, Count 29 and 24 to the extent it was based on the entries into A103 and A104.

As a general matter, the Supreme Court reads this exception to apply broadly to "any claim arising out of" the detention of goods. Kosak, 465 U.S. at 854; see Ali v. Fed. Bureau of Prisons, 552 U.S. 214, 215, 218–21 (2008) (noting how broad the term "any" is in FTCA phrase "any law enforcement officer"); see also LeMarca v. United States, 34 F. Supp. 3d 784, 795 (N.D. Ohio 2014) ("[T]he scope of the detention of goods exception is broadly construed and applies to loss, theft, or negligent handling of seized property."); Green v. United States, No. 1:18 cv 631, 2020 WL 1312941, at *6 (E.D. Tex. Feb. 28, 2020) (noting detention for purposes of § 2680(c) includes possession that "was unauthorized, tortious, or wrongful" ), adopted by 2020 WL 1309994 (E.D. Tex. Mar. 19, 2020).

Two district courts that have addressed whether this exception applies to a situation like the one, where Task Force members are alleged to have taken Carmona's money while searching for Ramirez, Sr., have reached opposite conclusions. Compare Vitrano v. United States, No. 06 Civ. 6518 (JCF), 2009 WL 1011582, at *1, *9-*10 (S.D.N.Y. Apr. 14, 2009) (unreported) (applying detention-of-goods exception to claim officers stole $875 and a Rolex Watch during the plaintiff's arrest and search of his apartment), with Reynoso v. City & Cty. of San Francisco, No. C 10-00984 SI, 2012 WL 646232, *4-*5 (N.D. Cal. Feb. 28, 2012) (unreported) (holding detention-of-goods exception did not apply to FTCA claim that federal agent took $200,000 while executing search warrant). This Court concludes that the detention-of-goods exception does apply in this case. Therefore, the FTCA does not waive the United States' sovereign immunity from this claim.

The Court, therefore, DISMISSES this claim without prejudice for lack of subject matter jurisdiction.  See Garling, 849 F. 3d at 1292; Barnes, 776 F.3d at 1151-52.  Even if the Court had jurisdiction to consider this claim, however, Plaintiffs have failed to support it with sufficient evidence to survive summary judgment.  Carmona's money was not discovered missing from her coat until a month or so after the Task Force members' raided A103 and after her coat had undergone several transfers of possession.  This claim suffers from the further defect that it does not allege which Defendant committed the alleged wrongful act.

### IV. CONCLUSION

There are material factual disputes that remain as to whether Task Force members unconstitutionally entered and searched A103 and A104 on April 10, and unconstitutionally entered A103 on April 11.  A factfinder will need to resolve those disputes.  In light of those genuinely disputed issues of material fact, several of Plaintiffs' Bivens claims survive summary judgment.  Defendants are entitled to summary judgment on the rest of Plaintiffs' claims.

Accordingly, the Court rules as follows:

Because Plaintiffs cannot establish a Bivens claim against any still-unidentified John Doe Defendant, those Defendants are DISMISSED with prejudice.

Count 1 - The Court DENIES Defendants Reddish and Nelson summary judgment to the extent this count challenges the entry into A103 on April 10, DENIES Defendants Reddish, Nelson, Welch, Ferron, Roothoff, and Golding summary judgment

to the extent this count challenges the search of A103 on April 10, and GRANTS all other individual Defendants summary judgment.

Count 2 - The Court DENIES Defendants Reddish and Nelson summary judgment to the extent this count challenges the Task Force's entry into A104, DENIES Defendants Golding and Nelson summary judgment to the extent this claim challenges the search of A104, and GRANTS all other Defendants summary judgment.

Counts 3 through 12 – The Court GRANTS Defendants summary judgment.

Count 13 - The Court DENIES Defendant Reddish summary judgment to the extent this count challenges the Task Force's entry into A103 on April 11, and GRANTS all other Defendants summary judgment.

Counts 14 through 23 - The Court GRANTS Defendants summary judgment.

Count 24 through 33 – The Court DISMISSES these claims without prejudice for lack of subject matter jurisdiction.


Dated this ___23rd___ day of _____April___, 2020.


                                        BY THE COURT:


                                        *s/ David M. Ebel*
                                        _____
                                        David M. Ebel
                                        U. S. CIRCUIT COURT JUDGE